UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  09/27/2019

NORMA L. FIGUEROA,                        :
                                          :
                    Plaintiff,            :        **OPINION AND ORDER**
                                          :
            -against-                     :        18-CV-4534 (JLC)
                                          :
ANDREW M. SAUL,                           :
Commissioner, Social Security            :
Administration,[1]                        :
                                          :
                    Defendant.            :
-----------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge**.

Plaintiff Norma Figueroa brings this action seeking judicial review of a final determination by Defendant Andrew M. Saul, the Commissioner of the Social Security Administration, denying Figueroa's application for social security income ("SSI") benefits under the Social Security Act.  The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, Figueroa's motion is granted to the extent it seeks remand of the case, and the Commissioner's cross-motion is denied.

---

[1] Andrew M. Saul is now the Commissioner of the Social Security Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Saul is hereby substituted for former Acting Commissioner Nancy A. Berryhill as the defendant in this action.

**TABLE OF CONTENTS**

I.   BACKGROUND...............................................................................................1

   A.   Procedural Background ...............................................................................1

   B.   The Administrative Record...........................................................................2

      1.   Figueroa's Background...........................................................................2

      2.   Relevant Medical Evidence .....................................................................4

         a.   Treatment at La Casa De Salud .........................................................4

            1)   Treatment of Physical Impairments .....................................................5

            2)   Treatment of Mental Impairments ......................................................9

         b.   Medical Imaging Evidence ........................................................13

         c.   Medical Opinion Evidence ........................................................15

            1)   Assessment of Physical Impairments .................................................15

               a)   Lucy Palomino, D.N.P. – Treating Nurse Practitioner ...................15

               b)   Iqbal Teli, M.D. – Consultative Internist .......................................17

            2)   Assessment of Mental Impairments ...................................................18

               a)   Arcangelo Lubrano, M.D. – Treating Physician.............................18

               b)   John Nikkah, Ph.D. – Consultative Psychologist ...........................20

               c)   Tammy Inman-Dundon, Ph.D. – Stage Agency Psychologist..........22

      3.   ALJ Hearing ..................................................................................25

4. Vocational Testimony ....................................................................... 27

II. DISCUSSION ...................................................................................... 28

A. Legal Standards ............................................................................... 28

1. Judicial Review of Commissioner's Determinations ................................... 28

2. Commissioner's Determination of Disability ............................................. 30

a. Five-Step Inquiry .................................................................... 31

b. Duty to Develop the Record ..................................................... 32

c. Treating Physician's Rule ......................................................... 34

d. Claimant's Credibility .............................................................. 37

B. The ALJ's Decision ........................................................................... 38

C. Analysis ........................................................................................... 42

1. The ALJ's Step Three Determination is Substantially Supported By the
Record ........................................................................................... 43

a. Listing 1.02 ............................................................................ 44

b. Listing 1.04 ............................................................................ 48

c. Listings 12.04 and 12.06 .......................................................... 50

2. The ALJ's Physical RFC Determination is Not Supported by Substantial
Evidence Because the ALJ Did Not Fully Develop the Record .......................... 56

3. The ALJ's Violation of the Treating Physician Rule in Determining
Figueroa's Mental RFC was Harmless .................................................... 65

4. The ALJ Should Reevaluate Her Credibility Determination on Remand .. 74

5.   The ALJ Denied Figueroa Due Process .......................................................... 76

III.  CONCLUSION ................................................................................................ 78

# I. BACKGROUND

## A. Procedural Background

Figueroa filed an application for SSI benefits on December 15, 2014. Administrative Record ("AR"), Dkt. No. 12, at 240. The alleged disability onset date is March 20, 2008. *Id.* The Social Security Administration ("SSA") denied her application on January 29, 2015, *id.* at 190, after which Figueroa requested an administrative hearing. *Id.* at 196. Represented by counsel, Figueroa appeared before Administrative Law Judge ("ALJ") Miriam L. Shire on April 6, 2017 in the Bronx. *Id.* at 44. In a written decision dated October 3, 2017, the ALJ found that Figueroa was not disabled for purposes of receiving Social Security benefits. *Id.* at 10. After Figueroa filed an appeal of the decision, on March 27, 2018, the Appeals Council denied Figueroa's request for a review of the ALJ's decision, which thereby became the Commissioner's final determination. *Id.* at 1.[2]

The current action was initiated on May 22, 2018 when Figueroa, again represented by counsel, filed a complaint seeking judicial review of the

---

[2] Figueroa filed two prior applications, one on March 27, 2008 and another on June 30, 2011, the denials of which were neither appealed nor re-opened. *Id.* at 179. While neither party suggests otherwise, the prior ALJ decisions are not at issue before the Court. Accordingly, the relevant period of alleged disability is from December 15, 2014, the current application's filing date, through October 3, 2017, the date the third ALJ issued her decision. *See* Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 16, at 1; Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of Defendant's Cross-Motion for Judgment on the Pleadings ("Def. Mem."), Dkt. No. 21, at 1. The Commissioner appears to have made the same typographical error as the index of the administrative record, indicating that the latest ALJ decision was issued on September 28, 2017, when, in fact, it was issued on October 3, 2017.

Commissioner's decision under 42 U.S.C. §§ 405(g) and 1383(c)(3). Complaint, Dkt. No. 2 at 2. The Commissioner responded by filing the administrative record on August 22, 2018. AR, Dkt. No. 12. Figueroa moved for judgment on the pleadings pursuant to Rule 12(c) on December 19, 2018, seeking reversal of the Commissioner's decision, or alternatively, a remand for further proceedings. Motion for Judgment on the Pleadings ("Pl. Mot."), Dkt. No. 15. On May 3, 2019, the Commissioner cross-moved for judgment on the pleadings. Cross-Motion for Judgment on the Pleadings, Dkt. No. 20. No reply papers were filed.

## B. The Administrative Record

### 1. Figueroa's Background

Figueroa was born on May 3, 1967. AR at 240. She was 40 years old on the alleged disability onset date and 47 years old at the time of her SSI application. Figueroa has three adult children who do not live with her; at the time of the hearing, she was living alone in a three-bedroom apartment in the Bronx. *Id.* at 57–58, 241. Her sister and mother, who had helped her keep up the apartment, had recently moved upstate. *Id.* at 58, 337–38. Although Figueroa reported being married in her application, *id.* at 240, treatment notes listed her marital status as single. *Id.* at 919.[3]

Figueroa did not complete high school; her education ended at the eighth grade. *Id.* at 50. When she was in school, she received special education due to her

---

[3] One progress note briefly mentions her "ex-husband's recent death," but no other details are provided in the record. *Id.* at 763.

difficulty reading and writing. *Id.* at 87–88, 269. She claims that she still cannot read or write without difficulty. *Id.* at 55–56. Although she went to beauty school in 1995 and did cosmetic direct sales work from home shortly thereafter, she ultimately stopped working due to her embarrassment from making mistakes when reading and writing orders. *Id.* at 50–56. She reported receiving financial support from the HIV/AIDS Services Administration ("HASA"). *Id.* at 57, 272–273.[4]

During the hearing and in her submissions to the SSA and reports to examiners, Figueroa described the scope of her ability to function and perform daily tasks. She claimed not being able to "walk, stand or sit for long periods." *Id.* at 283. Figueroa specifically described not being able to walk more than two to three blocks without stopping to rest. *Id.* at 87, 278. She reported that she uses a cane for balance as well as braces for her knees, ankle, and back for support. *Id.* at 60–61, 89–91, 283. While she is able to dress, bathe, and groom herself, *id.* at 337, 340, she "takes a long time to get ready." *Id.* at 283. She struggles to cook and prepare food, mop and clean her apartment, do laundry, shop, and take public transportation. *Id.* at 57, 337. Figueroa explained that she purchases her groceries three blocks away but has them delivered to her home. *Id.* at 84–85. Because she "is often anxious when having to go out" or "doing [anything] by [her]self," she "does not want to get up or go out most of the time." *Id.* at 92, 278, 283.

---

[4] Figueroa had been diagnosed with human immunodeficiency virus ("HIV") on August 16, 2007. *Id.* at 585.

Figueroa's SSI claim was based on a spinal disc condition, pain in both knees, HIV, nerve problems, hypertension, bipolar disorder, and sleep problems. *Id.* at 178. Her principal impairments concern her knee, back, and mental conditions.[5] She had been treated for depression and anxiety, primarily by medication, for the four years preceding the hearing. AR at 389–93, 408–11, 416–19, 436–38, 454–60, 465–71, 475–81, 493–98, 501–06, 511–16, 519–23, 534–38, 562–64, 603–05, 619–21, 629–31, 639–41, 648–49, 663–64, 674–77, 693–99, 707–24, 736–44, 747–52, 769–71, 788–90, 807–09, 818–31, 837–67, 871–86, 892–897, 903–18. Figueroa had also been receiving pain management for her knee and back impairments until October 28, 2015 when she was discharged for noncompliance with treatment. *Id.* at 774. There has since been no record of treatment for her knee and back pain.

## 2. Relevant Medical Evidence

### a. Treatment at La Casa De Salud

Figueroa received treatment at La Casa De Salud for her various conditions. Although the relevant period of alleged disability is from December 15, 2014 to October 3, 2017, the record contains treatment notes from the facility spanning January 24, 2013 through April 4, 2017.[6]

---

[5] Figueroa's hypertension and nerve and sleep problems were neither discussed at the hearing nor developed in the record, and her HIV condition appears to be stabilized by medication. AR. at 755. She does not address any of these conditions in her motion.

[6] While the ALJ was not required to consider evidence that predates the filing date, *Brogan-Dawley v. Astrue*, 484 F. App'x 632, 633 (2d Cir. 2012) (ALJ not required to consider medical evidence that predated or postdated relevant period for purposes of severity determination) (citation omitted), such evidence may nevertheless be

### 1) Treatment of Physical Impairments

Figueroa's knee and back pain were primarily treated by nurse practitioner Lamour-Ocean, N.P., from September 2013 through October 2015.  AR at 450–52, 461–63, 472–73, 482–83, 491–92, 499–500, 507–08, 517–18, 529–31, 550–52, 565–71, 595–99, 606–08, 612–14, 632–34, 642–47, 650–51, 665–67, 678–80, 690–92, 772–87, 803–06, 815–817.

Figueroa complained of moderate to severe bilateral knee pain, although occasionally she focused on her left knee.  AR at  382–86, 406–07, 414–15, 450–52, 461–63, 472–73, 482–83, 491–92, 499–500, 526–31, 550–59, 565–71, 595–99, 606–08, 612–14, 632–34, 642–47, 650–51, 665–67, 678–80, 690–92, 782–83, 815–17, 832. At various times, Figueroa described the pain as discomforting, aching, shooting, piercing, sometimes sharp and sometimes dull, throbbing, and diffuse, and occurring constantly, though there was no radiation.  *Id.*  Figueroa indicated that the pain was aggravated by daily activities, bending, climbing and descending stairs, walking, standing, and moving.  *Id.*  Figueroa reported the following symptoms: decreased range of motion, difficulty initiating sleep, difficulty bending, ecchymosis, erythema, fever, joint instability, decreased mobility, numbness, bruising, limping, locking, swelling, crepitus, joint clicking, and joint and muscle stiffness.  *Id.*  She stated that while the symptoms were chronic and non-traumatic, they occurred at rest.  *Id.*  Her symptoms were reportedly relieved by nonsteroidal

---

probative, particularly because Figueroa's alleged onset date predates the filing of her application and therefore may shed light on an ongoing, chronic impairment.

anti-inflammatory drugs, pain medications, physical therapy, injection, and rest.
*Id.* Figueroa rated her best knee pain as two out of ten and her worst knee pain as
nine out of ten. *Id.*

Upon examination of Figueroa's knees, Lamour-Ocean noted the following
pertinent negatives: decreased mobility, difficulty bending, bruising, joint
tenderness, nocturnal awakening, nocturnal pain, numbness, popping, spasms,
swelling, tingling in the arms and legs, and weakness. *Id.* The knee evaluation
also consistently revealed the following findings: normal gait and skin, neutral
alignment, normal flexibility, mild swelling, no effusion, no ecchymosis, and no
atrophy. *Id.* The evaluation included patella, laxity, meniscal, and strength tests,
all of which resulted in negative or otherwise normal findings. *Id.* Figueroa,
however, tested positive on her right knee during the McMurray's—Medial
Meniscal Test. *Id.*[7] Both knees had a range of 135 degrees flexed and zero degrees
extended, while maximum tenderness was found at the medial joint line of both
knees. *Id.*

Figueroa also complained of moderate to severe lower back pain, which she
described as diffuse, aching, piercing, burning, and sharp, and occurring
persistently. *Id.* at 399–401, 450–52, 461–63, 472–73, 482–83, 491–92, 499–500,
507–08, 517–18, 526–28, 612–14, 690–92, 772–81, 784–87, 803–06. Although
Figueroa usually denied radiation of pain, she indicated on two occasions that the

---

[7] A McMurray's Test tests for injuries to the meniscal structures of the knee. A
positive McMurray's indicates injury. Stedman's Medical Dictionary 906520 (Nov.
2014).

pain radiated to her legs.  *Id.*  On one other occasion, Figueroa reported numbness and paresthesia.  *Id.*  Figueroa indicated that the pain was aggravated by daily activities, ascending stairs, standing, bending, lifting, extension and flexion.  *Id.* The symptoms, which she stated were chronic and non-traumatic, were reportedly relieved by exercise, pain medication, and physical therapy.  *Id.*  Figueroa rated her worst back pain as ten out of ten; there was no rating for her best back pain.  *Id.*

Upon examination of Figueroa's back, Lamour-Ocean noted, as a pertinent negative, decreased mobility.  *Id.*  The lumbar spine evaluation also consistently revealed the following findings: normal gait and skin, flatback posture, normal lower extremity muscle tone, normal paraspinous muscle tone, no spasm, max tenderness in the piriformis muscle, motion without pain, crepitus or evident stability, painless palpation of the greater trochanter, buttocks and sacroiliac joints, and negative femoral stretch and Patrick's (Faber) tests.  *Id.*  Back pain, however, was produced by the straight leg raise.  *Id.*  While inspection of the lumbar spine revealed painful active range of motion, the passive range of motion was full and pain-free with no restrictions in spinal flexion (with a range of 80 degrees), extension (with a range of 35 degrees), or lumbar lateral bending (with a range of 35 degrees on each side).  *Id.*  Although Figueroa's gait was normal on nearly every inspection, on September 30, 2015, Lamour-Ocean noted that her "[g]ait is antalgic on the right but not broad-based.  The patient is able to heel-and-toe-walk normally."  *Id.* at 777.  Limping was only noted on two occasions during the alleged disability period: August 28 and October 28, 2015.  *Id.* at 774, 805.

The following pain medications were prescribed for Figueroa's knee and back pain: Percocet, Mobic, Zanaflex, and Neurontin. *Id.* at 383, 406, 817. As of July 2, 2015, Figueroa reported that the medications resulted in functional improvement. *Id.* at 551. Lamour-Ocean therefore intended to "continue to manage with current therapeutic interventions and address new concerns as they arise." *Id.*

In addition to prescribing medication, Lamour-Ocean made several recommendations and referrals. With respect to her knee pain, Figueroa was instructed to exercise and increase her activity level. *Id.* at 383. She was also advised to elevate her legs above heart level, to rest her knees, and to wear her knee brace. *Id.* at 530. With respect to Figueroa's back condition, Lamour-Ocean had advised her to follow an exercise program and discussed physical therapy with her. *Id.* at 401. Lamour-Ocean had referred Figueroa to neurosurgery for her severe knee arthritis and to orthopedic surgery for her disc degenerative disease. *Id.* at 776–83. However, on July 31, 2015, Lamour-Ocean noted that Figueroa "missed her [neurosurgery] appointment at Jacobi because she was busy." *Id.* at 817. On August 28, 2015, Lamour-Ocean indicated that Figueroa was "non-compliant with specialty referrals, [she] missed her appointment with neurosurgery at [L]incoln [H]ospital and Jacobi [H]ospital [twice]. [She] [r]efused to go to physical therapy." *Id.* at 805. After counseling Figueroa "regarding the importance of keeping her appointment," Figueroa was rescheduled for a third time. *Id.*

Lamour-Ocean ultimately discharged Figueroa from her care on October 28, 2015:

> [Figueroa] has been on pain management over three years with little to no progress. Patient has exhibited non[-]complian[t] behaviors, including those tied directly to my treatment recommendation that she participates in physical therapy, joint injection and [epidural steroid injection] offered numerous[] times but she refused claiming a f[ea]r of needle[s]. She missed all her referral appointments, neurosurgery and orthopedic. It is appropriate to discharge her from my care because her needs exceed the scope of my practice and her non[-]compliant behaviors may endanger the clinic. [I] offered to help with other treatments for her chronic pain, but she refused. She was provided with [a] 30[-]day[] supply of medications and a referral to another pain management.

*Id.* at 774. There is no documented treatment of Figueroa's knee and back pain after October 28, 2015.

Figueroa's HIV condition was primarily monitored by nurse practitioner Lucy Palomino, D.N.P. *Id.* at 396–98, 414–15, 484–89, 526–28, 539–43, 547–48, 574–81, 585–91, 615–18, 625–28, 635–38, 652–59, 703–06, 726–35, 753–61, 791–95, 868–70, 887–91, 898–902, 919–23, 924. She was diagnosed as HIV positive on August 16, 2007. *Id.* Figueroa generally adhered to her medications, which included Stribild and Genvoya. *Id.* Palomino assessed Figueroa's HIV condition as stable and asymptomatic. *Id.* As her viral load was undetectable and her T-cell count stable, Palomino determined that there was no need for treatment at that time. *Id.*

## 2) Treatment of Mental Impairments

Figueroa was primarily seen by physician Arcangelo Lubrano, M.D., from January 2013 through April 2017 on a nearly monthly basis. *Id.* at 389–93, 408–11, 416–19, 436–38, 454–60, 465–71, 475–81, 493–98, 501–06, 511–16, 519–23, 534–38, 562–64, 603–05, 619–21, 629–31, 639–41, 648–49, 663–64, 674–77, 693–99, 707–24, 736–44, 747–52, 769–71, 788–90, 807–09, 818–31, 837–67, 871–86, 892–897, 903–

18.  Throughout this time, Figueroa presented with depression, anxiety, bipolar disorder, behavior disorder, and, at one point, confusion.  *Id.*  She reported the following range of symptoms:  anxious/fearful thoughts; compulsive thoughts; racing thoughts; depressed mood; decreased need for sleep; difficulty falling asleep; difficulty staying asleep; difficulty concentrating; easily startled; excessive worry; fatigue; hallucinations; paranoia; personality change; feelings of guilt; and feelings of invulnerability.  *Id.*  Figueroa reported that these symptoms were severe, occurring daily, and poorly controlled.  *Id.* She also indicated that functioning was somewhat to very difficult.  *Id.*  She would occasionally describe her mood as "so, so," "anxious," and, on two occasions, "not good."  *Id.*  The first time Figueroa stated she was "not good" was "due to having a lot of knee pain," while the second time was "due to being discharged from pain management."  *Id.*

Dr. Lubrano consistently observed no evidence of delusions, hallucinations or suicidal ideation.  *Id.*  He also associated her anxiety, depression, and bipolar disorder with her chronic pain.  *Id.*  Dr. Lubrano found no evidence of psychotic or manic symptoms.  *Id.*  Although on one occasion Figueroa's speech was slurred and poor memory was documented on another visit, Dr. Lubrano continued to report after nearly each visit that Figueroa was stable on present medication and that she was fully oriented, pleasant, cooperative and well-related.  *Id.*  Dr. Lubrano diagnosed post-traumatic stress disorder, major depressive disorder, and bipolar

disorder.  *Id.*  Her Global Assessment of Functioning ("GAF") scores ranged from 50–60.  *Id.*[8]

Dr. Lubrano assessed that Figueroa's initial symptoms were continuing at first but then began to improve.  *Id.*  He had prescribed a number of psychiatric medications: Doxepin, Xanax, Ambien, Lamictal, Cymbalta, Trazodone, Depakote, Klonopin, Celexa, and Effexor.  *Id.*  At nearly each visit, Figueroa's medications were renewed as she reported minimal to moderate improvement in response to medication and denied any side effects.  *Id.*

In addition to medication management with Dr. Lubrano, Figueroa attended individual psychotherapy sessions with social worker Maya Fukuda, L.M.S.W.  *Id.* at 762–65, 796–99, 811–14.  There are progress notes from three 30-minute sessions, despite an indication that Figueroa was to follow up every two weeks.  *Id.* On August 10, 2015, the first documented visit, Figueroa reported "feel[ing] very depressed with racing thoughts."  *Id.* at 811–14.  Fukuda "[p]rovided counseling regarding her relationship dynamics with family and coping skills for depression, including breathing and relaxation techniques."  *Id.*

_____

[8] "The GAF is 'a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning,' and runs from 0 to 100." *Maldonado v. Berryhill*, No. 16-CV-165 (JLC), 2017 WL 946329, at *8 n.21 (S.D.N.Y. Mar. 10, 2017) (quoting *Petrie*, 412 F. App'x at 406).  "A score of 41–50 indicates serious symptoms, a score of 51–60 indicates moderate symptoms and a score of 61–70 indicates some mild symptoms or some difficulty in social or occupational functioning . . . ."  *Cabrera v. Berryhill*, No. 16-CV-4311 (AT) (JLC), 2017 WL 3172964, at *3 (S.D.N.Y. July 25, 2017), *adopted by* 2017 WL 3686760 (S.D.N.Y. Aug. 25, 2017) (citing *Maldonado v. Colvin*, No. 15-CV-4016 (HBP), 2017 WL 775829, at *5 (S.D.N.Y. Feb. 28, 2017)).

On September 10, 2015, Figueroa reported that her bipolar symptoms were the same and that the medications were working well. *Id.* at 796–99. Fukuda again discussed with Figueroa coping skills, alternative ways of thinking, and relaxation techniques. *Id.* Fukuda noted no significant changes in Figueroa's mood/affect, thought process/orientation, motor activity and speech, behavior/functioning, medical condition, and substance abuse/addictive behaviors. Figueroa also did not present any new issues, stressors, or extraordinary events during that session. *Id.*

On December 2, 2015, Figueroa again reported her symptoms had not changed and that her medications were working well. *Id.* at 762–65. Figueroa reported that "she had been experiencing a lot of stress recently and not utilizing coping skills discussed in session." *Id.* While again noting no significant changes or issues presented during the session, Fukuda observed minimal progress. *Id.* According to Fukuda, Figueroa appeared mildly depressed and had a labile affect, but was observed to be present, alert, and fully oriented. *Id.* Figueroa "engaged well" with Fukuda:

> [Figueroa] provid[ed] [a] narrative of activities and events since [the] last session that have affected [her] mood and behavior. [Figueroa] reports feeling upset about being discharged from pain management at this clinic, and reported she had been going through [a] tough time with family health concerns and [her] ex-husband's recent death. [Fukuda] engaged [Figueroa] in reflecting on her current stressors and upcoming travel plans, discussing [the] importance of continued self-care and regained sense of control. [Figueroa] agreed she needed to take better care of herself, and [to] continue using coping strategies for practice to address thinking patterns that adversely affect mood, functioning and behavior.

*Id.*

### b. Medical Imaging Evidence

On January 19, 2015, an X-ray was taken of Figueroa's lumbosacral spine. *Id.* at 344. According to radiologist Lawrence S. Liebman, M.D., "[t]here is narrowing of the LE-L4 disc space. There is moderate straightening. There is no compression fracture. There is facet joint arthropathy." *Id.* Dr. Liebman's impression of her lumbosacral spine was degenerative changes. *Id.* An X-ray of her thoracic spine taken on the same day revealed that "[t]he height of the vertebral bodies and intervertebral disc spaces is relatively well maintained. The pedicles are intact. There is lower thoracic straightening. There are small hyperostoses." *Id.* at 345. Dr. Liebman's impression of the thoracic spine was straightening. *Id.*

On January 13, 2017, another X-ray was conducted of Figueroa's lumbar spine. Radiologist Ellen L. Wolf, M.D., had the following impression: "No compression fractures. Moderate narrowing at the L5/S1 disc space. Degenerative changes." *Id.* at 833. Noting back pain stemming from a fall, she made the following interpretation: "AP and lateral views of the lumbosacral spine show a moderate narrowing at the L5-S1 disc space. There is lower lumbar spinal facet arthropathy. Small osteophytes. No compression fractures. There is moderate stool in the colon." *Id.*

An X-ray was also conducted of Figueroa's left knee that same day. *Id.* at 835. Dr. Wolf's impression was the following: "Mild degenerative changes. No fracture or effusion. No significant change compared with the prior study of

1/26/2010." *Id.* Noting left knee pain stemming from a fall, she made the following interpretation: "There is mild medial compartment predominant joint space narrowing with small periarticular osteophytes. There is no suprapatellar knee joint effusion. There is no acute fracture of dislocation." *Id.*

On July 8, 2017, radiologist Samuel Mayerfield, M.D., conducted an MRI of Figuroa's lumbar spine. *Id.* at 926–27. Dr. Mayerfeld noted her complaints "of low back pain radiating to bilateral leg/buttock with numbness and weakness and difficulty walking." *Id.* Dr. Mayerfield made the following interpretation:

> T11-T12 disc bulge. Conus terminates at T12-L1 without signal abnormality or focal expansion.
> T12-L1, L1-L2, and L2-LE: Normal.
> L3-L4: Moderate central stenosis, bilateral foraminal stenosis, annular disc bulge, superimposed posterior central disc herniation, ligamentous and facet hypertrophy noted.
> L4-L5: Grade 1 anterolisthesis with moderate-to-marked central stenosis, bilateral foraminal stenosis, disc bulge, ligamentous and facet hypertrophy without pars defects.
> L5-S1: Annular disc bulge and superimposed posterior central disc herniation with thecal sac deformity. Mild foraminal narrowing.
> Disc space narrowing, disc hydration loss, bulging at T11-T12 and L3-L4 through L5-S1 levels inclusively.
> No vertebral fracture, infiltrative marrow process or intraosseous lesion noted. The paraspinal soft tissues are unremarkable.

*Id.* Dr. Mayerfield's impression consisted of the following:

> L4-L5: Grade 1 anterolisthesis, moderate-to-marked central stenosis, bilateral foraminal stenosis.
> L3-L4: Moderate central stenosis, bilateral foraminal stenosis, disc bulge and superimposed posterior central disc herniation.
> L5-S1: Annular disc bulge and superimposed posterior central disc herniation with thecal sac deformity. Multilevel arthrosis.
> Disc bulge T11-T12.

*Id.*

### c.  Medical Opinion Evidence

#### 1)  Assessment of Physical Impairments

##### a)  Lucy Palomino, D.N.P. – Treating Nurse Practitioner

On a Medical Report on Adult with Allegation of Human Immunodeficiency Virus (HIV) Infection dated January 10, 2015, nurse practitioner Lucy Palomino, D.N.P., marked no opportunistic and indicator diseases or other manifestations of HIV infection.  *Id.* at 332–34.  She included a comment that Figueroa suffers from depression and anxiety.  *Id.* at 334.

On May 2, 2015, Palomino completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) for Figueroa.  *Id.* at 347–52.  She determined that Figueroa could lift and carry up to ten pounds continuously, between 11 to 20 pounds occasionally, and never more than 20 pounds.  *Id.* According to Palomino, Figueroa could sit, stand, walk for one hour at a time each. *Id.*  In an eight-hour work day, Figueroa could sit for a total of one hour, stand for a total of 30 minutes, and walk for a total of one hour.  *Id.*  Palomino noted that Figueroa would need frequent break periods and require the use of a cane to ambulate.  *Id.*  Without a cane, Figueroa could only ambulate 20 feet.  *Id.*  While Palomino remarked that the use of a cane was medically necessary, Figueroa could use her free hand to carry small objects.  *Id.*  Palomino left blank the section asking for particular medical or clinical findings in support of the assessment for sitting, standing, and walking.  *Id.*

Palomino noted that while Figueroa could reach continuously with both hands and handle, finger and feel frequently, she could only occasionally push and pull. *Id.* Figueroa would be able to operate foot controls with either foot frequently. *Id.* Again, Palomino left blank the sections asking for findings in support of the assessments for use of feet and hands. *Id.*

Regarding postural activities, Palomino determined that Figueroa could never climb (whether stairs, ramps, ladders or scaffolds), balance, crouch, or crawl. *Id.* Figueroa could occasionally stoop and kneel. *Id.* As to findings in support of this assessment, Palomino noted "back [illegible] disc herniation. Sciatica." *Id.* Concerning environmental limitations, Figueroa could never be exposed to moving mechanical parts, operating a motor vehicle, humidity and wetness, dust, odors, fumes and pulmonary irritants, and vibrations. *Id.* She could occasionally be exposed to extreme cold and heat and frequently be exposed to unprotected heights. *Id.* Palomino noted this assessment was based on the fact that Figueroa "takes anxiolytics." *Id.*

With respect to the impact of Figueroa's physical impairments on activities, Palomino opined that Figueroa could neither travel without a companion for assistance nor climb a few steps at a reasonable pace with the use of a single hand rail. *Id.* Figueroa could, however, ambulate without using a wheelchair, walker, or two canes or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, or use papers/files. *Id.*

Palomino left blank whether Figueroa could perform activities like shopping. Palomino added to her assessment the following notes: "anxiety [illegible] → takes anxiolytics [and] ability to move [illegible] and focus." *Id.* Palomino concluded that Figueroa's impairments lasted or would last for 12 consecutive months. *Id.*

### b) Iqbal Teli, M.D. – Consultative Internist

On January 19, 2015, internist Iqbal Teli, M.D., conducted an internal medicine examination of Figueroa. *Id.* at 340–43. He noted her history of HIV, left knee pain, low back pain, asthma, and right ankle pain. *Id.* Dr. Teli also noted, with respect to daily activities, that she is able to shower and dress herself. *Id.*

Upon physical examination, Dr. Teli reported that Figueroa appeared to be in no acute distress and that her gait and stance were normal. *Id.* She could walk heels and toes without difficulty but only squat 30%. *Id.* He noted that Figueroa uses a cane for balance but "[m]edically she does not need it." *Id.* Figueroa did not need help changing for the exam or getting on and off the exam table, and she was able to rise from the chair without difficulty. *Id.*

As to Figueroa's musculoskeletal system, Dr. Teli reported that the "[c]ervical spine shows full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." *Id.* While there was no scoliosis, kyphosis, or abnormality in the thoracic spine, Dr. Teli observed straightening. *Id.* He also noted lumbar spine flexion of 85 degrees, full extension, lateral flexion bilaterally, and full rotary movement bilaterally. *Id.* She had a hip flexion of 95 degrees with tenderness over her lower back. *Id.* Otherwise, the straight leg raise test turned out negative

bilaterally. *Id.* Dr. Teli determined Figueroa had a full range of motion for shoulders, elbows, forearms, wrists, knees, and ankles. *Id.* Her joints were stable and nontender, and there was no evidence of subluxations, contractures, ankylosis, thickening, redness, heat, swelling, or effusion. *Id.*

Dr. Teli noted no sensory deficit and determined her strength was five out of five in the upper and lower extremities. *Id.* Dr. Teli found no cyanosis, clubbing, or edema in these regions. *Id.* There was also no evidence of muscle atrophy or significant varicosities or trophic changes. *Id.* However, Dr. Teli found tenderness to both knees and over the right ankle. *Id.* While Dr. Teli gave Figueroa a guarded prognosis, he concluded only that she has moderate restrictions for squatting and should avoid dust and other respiratory irritants due to history of asthma. *Id.*

### 2) Assessment of Mental Impairments

#### a) Arcangelo Lubrano, M.D. – Treating Physician

On August 11, 2015, physician Arcangelo Lubrano, M.D., completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Figueroa. *Id.* at 354–56. Dr. Lubrano determined that Figueroa's ability to understand, remember and carry out instructions was affected by her mental impairment. *Id.* Specifically, Figueroa had a marked restriction on her abilities to understand and remember simple instructions and to make judgments on simple work-related decisions. *Id.* Further, not only did she have an extreme restriction on her ability to carry out simple instructions, she was also extremely limited in her abilities to understand, remember, and carry out complex instructions and to make

18

judgments on complex work-related decisions. *Id.* Dr. Lubrano cited a psychiatric evaluation in support of his assessment. *Id.*

Dr. Lubrano determined that Figueroa's abilities to interact appropriately with supervision, co-workers, and the public, as well as to respond to changes in the routine work setting, were affected by her mental impairment. *Id.* Specifically, while her ability to interact appropriately with co-workers was markedly limited, her abilities to interact appropriately with the public and supervisors and to respond appropriately to usual work situations and to changes in a routine work setting, were extremely limited. *Id.* In support of his assessment, Dr. Lubrano cited Figueroa's reports of "difficulty remembering things, concentrating, focusing on tasks. Also experiences anxiety and racing thoughts." *Id.* Dr. Lubrano opined that these limitations were first present in 2002. *Id.* He determined that Figueroa was able to manage benefits in her own best interest. *Id.*

On April 4, 2017, Dr. Lubrano filled out another Medical Source Statement of Ability to Do Work-Related Activities (Mental) for Figueroa. *Id.* at 376–78. Dr. Lubrano described Figueroa's ability to understand, remember and carry out simple instructions as markedly limited. *Id.* In addition, her abilities to make judgments on simple and complex work-related decisions and to understand, remember, and carry out complex instructions were extremely limited. *Id.* In support of this assessment, Dr. Lubrano noted "extreme isolation," "constant crying spells," "pervasive paranoid ideations," and "racing thoughts." *Id.*

Dr. Lubrano determined that Figueroa's ability to interact appropriately with the public and co-workers was markedly limited, whereas her abilities to interact with supervisors and to respond appropriately to usual work situations and to changes in a routine work setting were extremely limited. *Id.* Other than the remark that Figueroa is "usually isolated," Dr. Lubrano's handwritten notes regarding factors in support of his assessment are mostly illegible. *Id.* He also noted that Figueroa is "unable to concentrate and fully comprehend. Memory is compromised. Constant crying spells." *Id.* Dr. Lubrano believed Figueroa's limitations first presented themselves five years ago. *Id.* He noted that Figueroa takes methadone. *Id.* Unlike his previous assessment, Dr. Lubrano determined that Figueroa would not be able to manage benefits in her own best interest. *Id.*

### b) John Nikkah, Ph.D. – Consultative Psychologist

On January 19, 2015, psychologist John Nikkah, Ph.D., conducted a psychiatric evaluation of Figueroa. *Id.* at 335–39. She reported having depressive symptoms of dysphoric mood, loss of usual interests, irritability, diminished self-estimate, concentration difficulties, and diminished sense of pleasure. *Id.* Figueroa denied any current or past suicidal or homicidal ideations. *Id.* She reported that the onset of her depressive symptoms occurred approximately five years ago. *Id.* She reported anxiety-related symptoms of excessive apprehension and worry, being easily fatigued, irritability, restlessness, and difficulty concentrating. *Id.* She reported that the majority of her anxiety stems from worries regarding her physical health and lack of mobility. *Id.* She denied experiencing panic symptoms. *Id.* She

20

reported manic symptoms of distractibility, psychomotor agitation, decreased need for sleep, flight of ideas, and expansive mood. *Id.* She reported these manic symptoms and overall disturbances occurred approximately five years ago as well. *Id.* She denied both thought disorder symptoms and cognitive deficits. *Id.*

Upon mental status examination, Figueroa's demeanor and responsiveness to questioning were cooperative. *Id.* Her overall manner of relating was adequate. *Id.* Her posture, motor behavior, and eye contact were all normal. *Id.* Her speech was fluent and clear, and her expressive receptive language abilities were adequate. *Id.* Her thought processes were coherent and goal directed with no evidence of hallucinations, delusions or paranoia. *Id.* Figueroa appeared mildly depressed with a dysthymic mood. *Id.* She had clear sensorium and was oriented in person, place, and time. *Id.* Her attention and concentration were found to be mildly impaired, her recent and remote memory skills were found to be moderately impaired, her intellectual function was deemed to be average, and both her insight and judgment considered fair. *Id.*

Regarding her daily activities, Figueroa reported that she was able to dress, bathe, and groom herself, but that she had difficulty with cooking and preparing food, doing general cleaning, laundry, shopping, and taking public transportation due to limited mobility, pain symptoms, difficulty standing for long periods of time, lack of motivation, and distractibility to pain symptoms at times. *Id.* She reported that her sister was able to assist her with performing household tasks which she

found too difficult.  *Id.*  She reported positive and supportive family relationships and occasional socialization.  *Id.*

According to Dr. Nikkah, Figueroa was able to follow and understand simple directions and instructions and perform simple tasks independently.  *Id.*  She was mildly limited in her ability to maintain attention and concentration, make appropriate decisions, and relate adequately with others.  *Id.*  Figueroa was moderately limited in her ability to maintain a regular schedule, learn new tasks, perform complex tasks independently, and appropriately deal with stress.  *Id.*  Dr. Nikkah opined that these difficulties were caused by a combination of fatigue, distractibility, lack of motivation, and pain symptoms.  *Id.*  He concluded that the "results of the examination appeared to be consistent with psychiatric problems, but in itself this did not appear to be significant enough to interfere with [Figueroa's] ability to function on a daily basis."  *Id.*

Dr. Nikkah diagnosed unspecified bipolar and related disorder as well as generalized anxiety disorder.  *Id.*  He recommended that she continue with psychiatric treatment as currently provided, including individual psychological therapy.  *Id.*  He provided a fair prognosis, given the implementation of the recommendations and determined that she would be able to manage her own funds.  *Id.*

### c) Tammy Inman-Dundon, Ph.D. – Stage Agency Psychologist

On January 27, 2015, psychologist Tammy Inman-Dundon, Ph.D., completed a Psychiatric Review Technique assessment as part of a disability determination

explanation. *Id.* at 178–88. With respect to the paragraph A criteria of Listings 12.04 and 12.06, Dr. Inman-Dunon found that "medically determinable impairments were present that did not precisely satisfy the diagnostic criteria." *Id.* Concerning the paragraph B criteria, she found Figueroa was mildly restricted in activities of daily living, mildly restricted in maintaining social functioning, moderately restricted in maintaining concentration, persistence or pace, and had no repeated episodes of extended decompensation. *Id.* Dr. Inman-Dundon also indicated there was no evidence that established the presence of paragraph C criteria. *Id.*

Dr. Inman-Dundon concluded that while Figueroa's medically determinable impairments could reasonably be expected to produce her pain and other symptoms, her statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone. *Id.* In considering Figueroa's activities of daily living, medication, and treatment, Dr. Inman-Dundon assessed that Figueroa's statements regarding her symptoms were partially credible. *Id.* She noted that Figueroa "used cane at CE appt, states she always uses it for balance, medically she does not need it. Gait and stance normal, can walk w/no difficulty." *Id.*

Based on the foregoing assessment, Dr. Inman-Dundon determined Figueroa's mental residual functional capacity. As to her understanding and memory limitations, Figueroa was not significantly limited in her abilities to remember locations and work-like procedures or to understand and remember very

short and simple instructions. *Id.* However, she was moderately limited in her ability to understand and remember detailed instructions. *Id.*

Regarding her sustained concentration and persistence limitations, while there was no evidence of any limitation in her ability to carry out very short and simple instructions, she was not significantly limited in her abilities to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, and to make simple-work related decisions. *Id.* Figueroa was, however, moderately limited in her abilities to carry out detailed instructions, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.*

As to her social interaction limitations, Figueroa was not significantly limited in her abilities to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness. *Id.*

Concerning her adaptation limitations, Figueroa showed no evidence of limitation in her ability to be aware of normal hazards and take appropriate

precautions. *Id.* Further, while she was moderately limited in her ability to respond appropriately to changes in the work setting, she was not significantly limited in her abilities to travel in unfamiliar places or use public transportation or to set realistic goals or make plans independently of others. *Id.*

As part of her explanation of the mental residual functional capacity, Dr. Inman-Dundon observed that Figueroa "relates moderately well with others. She would be able to sustain simple work." *Id.*

### 3. ALJ Hearing

At the hearing before ALJ Shire on April 6, 2017, Figueroa appeared with counsel and was the only person to testify. *Id.* at 44–97.

Figueroa testified that although she had not worked in the last 15 years, her last employment was in direct sales of cosmetic products from her home. *Id.* at 51–52. She did not do this work for long, however, as she had trouble reading and writing and therefore became embarrassed when she made mistakes. *Id.* at 54–56. Figueroa explained that she was receiving financial assistance from HASA. *Id.* at 57. Regarding her HIV, Figueroa reported her last T-cell count was 300 and viral load was 75. *Id.* at 59. While she has been exposed to hepatitis-C, she had not experienced any opportunistic infections. *Id.*

As to her back and knee impairments, she had been receiving pain management at Casa De La Salud up until 2015 when her treating nurse practitioner Lamour-Ocean discharged her due to noncompliant behavior. *Id.* at 60–63, 774. Figueroa explained: "Instead of her being more into my problems of

pain, it's more like why you didn't do this, why you didn't do that, asking me about my problems. . . . She said she didn't like my attitude." *Id.* at 63. At the time of the hearing, Figueroa had not yet found another pain management provider, although she was currently living off pain medication refills, including Percocet, Gabapentin, and Tizanidine. *Id.* at 67, 79–80. She reported feeling tired after taking the medication, so she would stop whatever she was doing and stay at home to avoid hurting herself. *Id.* at 69. She was also currently on methadone for past drug addiction. *Id.* at 68. In addition to relief from medication, Figueroa used a cane and knee and back braces for support. *Id.* at 60, 89. She reported that she had been otherwise falling frequently. *Id.* at 61.

As to her mental impairments, Figueroa reported that she still saw Dr. Lubrano, who had been treating her on a nearly monthly basis for at least the past four years. *Id.* at 82–84. He had prescribed a myriad of psychiatric medication. *Id.* She found the medication to be helpful but continued to be "torment[ed]" by her thoughts and did not have many friends to whom she could talk. *Id.* Figueroa also described her difficulty focusing: "The thing is my mind doesn't focus. I can be talking to you and I could be thinking about something else." *Id.* at 85. In addition, she testified that she experienced anxiety whenever she had to do something by herself, but her Xanax medication "help[d] that [and] relax[ed] [her] nerves." *Id.* at 92.

Figueroa described experiencing pain in her back and her knees. Specifically, her back pain "shoots up and it could shoot down to [her] legs." *Id.* at 91. She

testified that she could sit for about half an hour before she needed to get up. *Id*. at 85–86. After moving around for a few minutes, she could sit back down. *Id*. She also testified that she could not stand for more than 45 minutes without a cane. *Id*. at 86–87. Figueroa estimated that she could walk three blocks before needing to rest for approximately a minute and then she could keep going. *Id*. at 87. Figueroa indicated that the maximum weight she could lift or carry is eight pounds. *Id*.

### 4. Vocational Testimony

After the hearing, the ALJ sought testimony from a vocational expert. *Id*. at 309. By response to a vocational interrogatory dated June 27, 2017, vocational expert Yaakov Taitz, Ph.D., opined about a hypothetical individual with the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) with the following limitations: a sit-stand option every 30 minutes; no exposure to temperature extremes, concentrated fumes, or excessive dust; can occasionally squat; and a simple job in that she can only occasionally tolerate changes in the workplace and can only occasionally tolerate social interaction with co-workers, supervisors, and the general public. *Id*. at 305–08. Dr. Taitz opined that the hypothetical individual could perform the following unskilled occupations which existed in the national economy: price marker, mail sorter, and router clerk. *Id*.

When the vocational interrogatory was proffered to Figueroa, her counsel disagreed with the hypothetical posed to the vocational expert. *Id*. at 315–19. She

asserted that Figueroa could not perform the full extent of light or sedentary work.

*Id.* at 315.  Instead, counsel proposed the following hypothetical:

> [S]ame age, education but with only being able to sit for an hour at a time, stand for 30 minutes at a time, and can only walk for an hour a day; can only push or pull occasionally.  A person with a marked limitation for understanding, remembering and carrying out simple instructions; marked limitation for interacting with the public and supervisors and with responding to change in the work environment; marked limitation in interacting with co-workers.  She would have to have instructions explained many times, very little interaction with supervisors, co-workers.  A person who can only bend occasionally, not squat.  The person would have to lie down during the day and rest, would need unscheduled breaks due to fatigue and pain.

*Id.* at 316.

## II.   DISCUSSION

### A. Legal Standards

#### 1.  Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides."  42 U.S.C. § 405(g).  The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence.  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the

substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g).

In certain circumstances, the court may remand a case solely for the calculation of benefits, rather than for further administrative proceedings. "In . . . situations[ ] where this Court has had no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the court has] opted simply to remand for a calculation of benefits." *Michaels v. Colvin*, 621 F. App'x 35, 38–39 (2d Cir. 2015) (quoting *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999)) (internal quotation marks omitted). The court may remand solely for the calculation of benefits when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless." *Williams v. Apfel*, 204 F.3d 48, 50 (2d Cir. 1999). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

## 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must take into account factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, at the second step the Commissioner determines whether the claimant has a "severe" impairment restricting her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a

listing in Appendix One of Subpart P of the regulations. 20 C.F.R. §
404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. §
404.1520(d). If not, the Commissioner continues to the fourth step and determines
whether the claimant has the residual functional capacity ("RFC") to perform her
past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not
have the RFC to perform past relevant work, the Commissioner completes the fifth
step and ascertains whether the claimant possesses the ability to perform any other
work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537
F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the
Commissioner at the fifth and final step, where the Commissioner must establish
that the claimant has the ability to perform some work in the national economy.
*See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims
v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ,
unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop
the record in light of the essentially non-adversarial nature of a benefits
proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation
marks omitted). As part of this duty, the ALJ must "investigate the facts and
develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at
111. Specifically, under the applicable regulations, the ALJ is required to develop a

claimant's complete medical history. *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)). The ALJ must develop the record even where the claimant has legal counsel. *See*, *e.g.*, *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See*, *e.g.*, *Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted). A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations." 20 C.F.R. § 404.1527(c)(2).

A treating physician's opinion is not always controlling. For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner. *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R.

§§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative."). Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis." *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998) (discussing ALJ's duty to seek additional information from treating physician if clinical findings are inadequate). As a result, "the 'treating physician rule' is inextricably linked to a broader duty to develop the record. Proper application of the rule ensures that the claimant's record is comprehensive, including all relevant treating physician diagnoses and opinions, and requires the ALJ to explain clearly how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the [treating physician] rule is robust."), *adopted by*, 2012 WL 6621722

(S.D.N.Y. Dec. 19, 2012).

To determine how much weight a treating physician's opinion should carry,

the ALJ must consider several factors outlined by the Second Circuit:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also Burgess*, 537 F.3d at 129; 20

C.F.R. § 404.1527(c)(2). "An ALJ's failure to 'explicitly' apply the *Burgess* factors

when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96

(quoting *Selian*, 708 F.3d at 419–20). If, based on these considerations, the ALJ

declines to give controlling weight to the treating physician's opinion, the ALJ must

nonetheless "comprehensively set forth reasons for the weight" ultimately assigned

to the treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133

(responsibility of determining weight to be afforded does not "exempt administrative

decisionmakers from their obligation . . . to explain why a treating physician's

opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R.

§ 404.1527(d)(2)). The regulations require that the SSA "always give good reasons

in [its] notice of determination or decision for the weight" given to the treating

physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration

in original) (citations omitted). Indeed, "[c]ourts have not hesitate[d] to remand

[cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*,

2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged.

*Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B. The ALJ's Decision

In her October 3, 2017 decision, the ALJ concluded that Figueroa was not disabled as defined by the Social Security Act. AR at 11. Following the five-step inquiry, at step one the ALJ found that Figueroa had not been engaged in substantial gainful activity since December 15, 2014, the date of the application. *Id.* at 12. At step two, the ALJ found that Figueroa had the severe impairments of HIV, degenerative disc disease, degenerative changes of the knees, and an affective disorder. *Id.* The ALJ determined that Figueroa's hypertension was "non-severe"

because it did not cause any significant degree of functional limitation. *Id.* at 12–13.

At step three, the ALJ found that none of Figueroa's impairments met or equaled the severity of the listed impairments. *Id.* at 13. In considering Listing 14.11 for Figueroa's HIV condition, the ALJ found no evidence in the record that Figueroa has any of the symptoms or conditions listed from 14.11(A)–(I). *Id.* Similarly, in considering Listing 1.04 for Figueroa's back condition, the ALJ found no evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis, as required under 1.04(A)–(C). *Id.* In considering Listing 1.02 for Figueroa's knee impairment, the ALJ concluded that there was no evidence that her impairment resulted in an inability to ambulate effectively as required by 1.02. *Id.* Finally, in considering Listing 12.04 for Figueroa's mental impairment, the ALJ concluded that Figueroa's condition did not satisfy the requirements of either the paragraph B or paragraph C criteria. *Id.* at 14. As to paragraph B criteria, the ALJ found that Figueroa had mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations in concentrating, persisting, or maintaining pace; and mild limitations in adapting or managing oneself. *Id.* at 13–14. As to paragraph C criteria, the ALJ found neither evidence of ongoing medical treatment, mental health therapy, psychological support, or a highly structured setting that diminishes the symptoms and signs of the disorder, nor evidence of marginal adjustment. *Id.* at 14.

At step four, the ALJ found that Figueroa had the residual functional

capacity to perform light work with the following additional limitations:

> The claimant must be afforded the opportunity to alternate sitting and
> standing every thirty minutes.  The claimant cannot be exposed to
> temperature extremes, to concentrated fumes, and to excessive dust.
> The claimant can only occasionally squat.  The claimant is limited to a
> simple job.  The claimant can only occasionally tolerate changes in the
> workplace; and can only occasionally tolerate social interaction with co-
> workers, supervisors, and the general public.

*Id.* at 15.[9]  To arrive at this residual functional capacity, the ALJ first found that

Figueroa did, in fact, suffer from physical and mental impairments, namely, HIV,

back pain, knee pain, and depression.  *Id.*  However, the ALJ found that Figueroa's

statements about the intensity, persistence and limiting effects of those

impairments were "not entirely consistent with the medical evidence and other

evidence in the record."  *Id.*  The ALJ appeared to consider the July 2017 MRI of

Figueroa's lumbar spine and the January 2015 X-ray of her left knee, as well as her

treatment for these conditions and her HIV condition.  *Id.* at 15–16.  Nevertheless,

the ALJ afforded significant weight to the opinions of consultative examiner Dr.

Teli because "the evidence of record [was] persuasive and consistent that the

---

[9] *See* 20 C.F.R. 416.967(b) ("Light work involves lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even
though the weight lifted may be very little, a job is in this category when it requires
a good deal of walking or standing, or when it involves sitting most of the time with
some pushing and pulling of arm or leg controls.  To be considered capable of
performing a full or wide range of light work, you must have the ability to do
substantially all of these activities.  If someone can do light work, we determine
that he or she can also do sedentary work, unless there are additional limiting
factors such as loss of fine dexterity or inability to sit for long periods of time.").

claimant has been able to perform the exertional demands of medium work at all times relevant to this decision." *Id.* at 16.[10] The ALJ gave little weight to Palomino's opinions because they were not supported by the treatment notes and because they were contradicted by Dr. Teli's findings. *Id.* After considering Figueroa's treatment for her mental impairment, the ALJ gave significant weight to the opinion of consultative psychiatrist Dr. Nikkah because the "evidence [was] persuasive and consistent that the claimant has been able to perform the mental demands of work at all times relevant to this decision." *Id.* at 17. The ALJ gave little weight to Dr. Lubrano's opinion because it was unsupported by treatment notes, contrary to the results of Figueroa's mental status examinations, and contradicted by Dr. Nikkah's findings. *Id.* The ALJ also considered the findings made by the state agency medical examiner. *Id.*

Because Figueroa had no past relevant work, the ALJ moved to step five, concluding that there were jobs that Figueroa could perform such as price marker, mail sorter, and router clerk, as noted in the vocational interrogatory. *Id.* at 18. In the procedural history of her decision, the ALJ acknowledged that counsel had proposed a different residual functional capacity in response to the ALJ's proffer letter of the vocational interrogatory. *Id.* at 10. However, the ALJ "not[ed] that she did not actually request that such hypothetical be submitted to the vocational expert. I did not submit such hypothetical to the vocational expert since the

_____

[10] The ALJ presumably meant light work, as is evidenced by her RFC determination.

hypothetical, as phrased by Ms. Gilmore, is improperly formed." *Id.* Accordingly, the ALJ concluded that Figueroa was not disabled within the meaning of the Social Security Act and denied her claim. *Id.* at 19.

## C. Analysis

Figueroa contends that the ALJ committed several errors by denying her SSI application. First, she claims that the ALJ improperly found that her impairments did not meet or equal certain listings. Pl. Mem. at 7–10. Second, she argues that the ALJ erred in not applying the treating physician rule when weighing the opinions of Dr. Lubrano and Palomino, and that their opinions were supported by substantial evidence in the record. *Id.* at 10–11. Finally, Figueroa claims that the ALJ erred by not properly considering the severity of her impairments and the side effects of her medications when determining her physical and mental limitations. *Id.* at 11.[11] The Commissioner disagrees and has responded to all of these claims in his cross-motion papers. Def. Mem. at 16–25.

As discussed below, the Court rejects Figueroa's first argument after determining that substantial evidence supports the ALJ's finding that her impairments did not meet or equal a listing. Concerning the second argument, the Court concludes that the ALJ did in fact violate the treating physician rule but only as to Dr. Lubrano and such error was harmless. However, the ALJ failed to

---

[11] Figueroa makes the separate argument that "the ALJ improperly found [she] could perform various jobs which exceed her RFC." *Id.* at 11–12. Given her discussion of Palomino and Dr. Lubrano's assessments, the Court construes this argument as related to her claim that the ALJ violated the treating physician rule.

adequately develop the record and therefore could not have properly assessed Figueroa's physical residual functional capacity. While it need not reach Figueroa's disagreement with the ALJ's credibility determination, the Court discusses it only to the extent that Figueroa's contentions raise potential problems that the ALJ may wish to address on remand. Finally, the ALJ violated Figueroa's due process rights when she denied Figueroa a meaningful opportunity to cross-examine the vocational expert.

### 1. The ALJ's Step Three Determination is Substantially Supported By the Record

The third step of the five-step test requires a determination of whether Figueroa had an impairment listed in Appendix 1 of the Regulations. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." *Dixon v. Shalala*, 54 F.3d 1019, 1022 (2d Cir. 1995). "The applicant bears the burden of proof [at this stage] of the sequential inquiry[.]" *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (alterations omitted). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original).

In determining whether the plaintiff meets or equals one of the Listings at step three, an ALJ must set forth a "specific rationale" in support of the conclusion. *McHugh v. Astrue*, No. 11-CV-00578 (MAT), 2013 WL 4015093, at *6–7 (W.D.N.Y.

Aug. 6, 2013) (citing *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982)). This requires that the ALJ's decision contain more than a brief, conclusory statement that the plaintiff fails to meet any of the Listings. *Id.* at *6. However, the ALJ's failure to provide a "specific rationale" is not necessarily fatal, if the "ALJ's disability determination can be 'reasonably inferred' based on 'substantial evidence' contained elsewhere in the opinion." *Id.* at *7 (quoting *Berry*, 675 F.2d at 468–69).

Figueroa claims that the ALJ incorrectly found she did not satisfy listings 1.02, 1.04, 12.04, and 12.06. Pl. Mem. at 7–10. The Court concludes that while the ALJ's analysis at step three of the inquiry was procedurally inadequate, her determination that Figueroa did not satisfy any listings is supported by substantial evidence.

### a. Listing 1.02

Section 1.02 outlines the conditions required to establish disorders of the joint. 20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 1.02. To constitute an Appendix 1 impairment, Figueroa's bilateral knee pain must qualify as a "[m]ajor dysfunction of a joint(s)," characterized by:

> gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis. With:
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 1.02.

"Inability [t]o ambulate effectively" means:

an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 1.00(B)(2)(b)(1). "To ambulate effectively,"

individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App'x 1, § 1.00(B)(2)(b)(2).

The ALJ's consideration of Listing 1.02 was undoubtedly cursory:

I [] considered whether the claimant's bilateral knee pain meets Listing 1.02, pertaining to major joint dysfunction. Although the evidence of record confirms that the claimant has severe knee pain, there is no evidence that her condition resulted in an inability to ambulate effectively for purposes of 1.02 B. For the foregoing reasons, the claimant's severe impairment does not meet Listing 1.02.

AR at 13.

"Although the ALJ did not explicitly discuss [specific reasons], [her] general conclusion (that [Figueroa] did not meet [Listing 1.02]) is supported by substantial evidence" demonstrating that her knee impairment did not result in an inability to ambulate effectively. *Solis v. Berryhill*, 692 F. App'x 46, 48 (2d Cir. 2017). For

instance, Figueroa reported leaving home every day and using standard public transportation to attend a methadone clinic. AR at 69–70. She also indicated that she was capable of walking short distances, including to a grocery store three blocks away from her home. *Id.* at 84, 87; *see, e.g., Camille v. Berryhill*, No. 17-CV-1283 (SALM), 2018 WL 3599736, at *7 (D. Conn. July 27, 2018) (claimant who could "ambulate 500 feet independently with the use of a straight cane" and "shop in stores" was able to ambulate effectively). Moreover, although evidence supports that Figueroa used a single cane, *e.g.*, AR at 60, there is no medical evidence that she required a hand-held assistive device that limited the function of both her upper extremities. *See, e.g., DiPalma v. Colvin*, 951 F. Supp. 2d 555, 571–72 (S.D.N.Y. 2013) (ALJ's determination that claimant did not meet Listing 1.02 supported by substantial evidence because claimant used single cane to walk). Taken alone or together, Figueroa's admissions are fatal to her claim that she was unable to ambulate effectively.

It is Figueroa's burden to "demonstrate that her disability [meets] 'all of the specified medical criteria.'" *Otts v. Comm'r*, 249 F. App'x 887, 888 (2d Cir. 2007) (emphasis omitted) (quoting *Sullivan*, 493 U.S. at 531). If a claimant's impairment "manifests only some of those criteria, no matter how severely," the impairment does not qualify. *Sullivan*, 493 U.S. at 530. Thus, her ability to ambulate effectively alone undermines her argument that she meets Listing 1.02.

In addition, Listing 1.02 requires a finding of a "gross anatomic deformity." 20 C.F.R. Part 404, Subpt. P, App'x 1, § 1.02. The objective medical evidence

establishes that Figueroa did not suffer from a "gross anatomic deformity." For example, there was never an indication by Figueroa's treating nurse practitioner Lamour-Ocean that she suffered from any deformity in any joint. Further, the single X-ray taken of Figueroa's left knee in the record, revealed only mild degenerative changes: "There is mild compartment predominant joint space narrowing with small periarticular osteophytes." AR at 835. However, the radiologist found no fracture, dislocation, joint effusion, or any other evidence of a "gross anatomic deformity." *Id.* Accordingly, the ALJ properly concluded that Figueroa did not satisfy the factors of Listing 1.02.

Figueroa separately claims that she has chronic constant pain in both her knees, with limitations of motion that cause her to limp. Pl. Mem. at 8. There is no doubt that she exhibited an antalgic gait on a few occasions and cannot walk prolonged distances, but those conditions do not amount to the requisite extreme limitation on her ability to walk. *See*, *e.g.*, *Marullo v. Astrue*, No. 08-CV-818 (LGF), 2010 WL 2869577, at *9 (W.D.N.Y. May 4, 2010) (plaintiff had not established ineffective ambulation despite her testimony that she took Tylenol for knee pain, had difficulty walking long distances, and had to sit down when she experienced pain in her legs), *adopted by*, 2010 WL 2869574 (S.D.N.Y. July 20, 2010); *Guy v. Astrue*, 615 F. Supp. 2d 143, 161 (S.D.N.Y. 2009) (claimant could ambulate effectively notwithstanding his "discomfort while walking" because he indicated his ability to walk short distances comfortably with a cane). Thus, substantial evidence

supported the ALJ's finding that Figueroa was not *per se* disabled under Listing 1.02.

### b. Listing 1.04

Figueroa also claims that the ALJ improperly found she did not meet or equal Listing 1.04. For a claimant to meet or equal the severity of Listing 1.04, the claimant must suffer from:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina), or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging manifested by severe burning or painful dysethesia, resulting in the need for changes in position or posture more than once every 2 hours; or
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Part 404, Subpt. P, App'x 1, § 1.04.

To be sure, the ALJ's consideration of Listing 1.04 is once again deficient:

> I considered whether the claimant's severe back condition meets the requirements of Listing 1.04, pertaining to spinal disorders. However, because there is no evidence that her back condition satisfies the requirements of 1.04 A through C, pertaining to spinal disorders with nerve root compression, spinal arachnoiditis, and lumbar spinal stenosis, respectively, the claimant's severe back condition does not meet Listing 1.04.

AR at 13. Despite this cursory analysis, substantial evidence supports the ALJ's conclusion that Figueroa did not meet Listing 1.04. As an initial matter, Figueroa's medical records lack sufficient evidence of nerve root or spinal cord compromise as required by the first paragraph of Listing 1.04, which Figueroa appears to concede in part. *See* Pl. Mem. at 9 ("the nerve root may not be compromised").

In any event, Figueroa appears to argue that Listing 1.04C applies as she claims she has a diagnosis of lumbar spinal stenosis with chronic pain and an inability to walk effectively. *Id.* To establish that she meets Listing 1.04C, Figueroa must demonstrate that she suffered (1) lumbar spinal stenosis with pseudoclaudication; (2) chronic nonradicular pain and weakness; and (3) an inability to ambulate effectively. 20 C.F.R., Part 404, Subpt. P, App'x 1, § 1.04C.

The Court concludes that the ALJ did, in fact, err by failing to consider the July 2017 MRI, submitted after the hearing, showing "moderate-to-marked central stenosis" and "bilateral foraminal stenosis" at L4-L5 and "[m]oderate central stenosis" and "bilateral foraminal stenosis" at L3-L4. AR at 926–27. However, while her lumbar spine MRI documented spinal stenosis, the record fails to establish an inability to ambulate effectively, as required to meet Listing 1.04C. Thus, whether or not the record demonstrates that Figueroa experienced "chronic nonradicular pain and weakness," she has not demonstrated that her back conditions meet each medical criterion in Listing 1.04C. *See*, *e.g.*, *Sanchez v. Colvin*, No. 12-CV-6203 (CM) (RLE), 2015 WL 4510031, at *16 (S.D.N.Y. June 1, 2015) (claimant did not satisfy Listing 1.04C because he "testified that he was able to take

public transportation, walk without assistance, and drive, which establish that he was able to ambulate effectively") (adopting report and recommendation); *Sickler v. Colvin*, No. 14-CV-1411 (JCF), 2015 WL 1600320, at *10 (S.D.N.Y. Apr. 9, 2015) ("Here, the ALJ's determination that the plaintiff fails to meet the criteria of Listing 1.04C is supported by substantial evidence. While Mr. Sickler did testify at his hearing that he had been using a cane and walking stick . . . the medical record reveals several instances of Mr. Sickler walking without an assistive device.").

There is also no medical evidence demonstrating that Figueroa suffered from "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," as required by Listing 1.04A, or "[s]pinal arachnoiditis . . . resulting in the need for changes in position or posture more than once every 2 hours," as required by Listing 1.04B. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 1.04. Therefore, substantial evidence supports the ALJ's finding that Figueroa did not meet the requirements of Listing 1.04 during the alleged disability period.

### c. Listings 12.04 and 12.06

Figueroa also claims that the ALJ improperly found she did not meet or equal Listings 12.04 and 12.06. Pl. Mem. at 9–10. While the ALJ only considered Listing 12.04, both listings require the existence of either paragraph A and paragraph B or paragraph A and paragraph C. *See* 20 C.F.R., Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06. The ALJ did not expressly address Listing 12.04's criteria of paragraph A, which requires medical documentation of specified symptoms or conditions. AR at

13.  However, even assuming Figueroa meets the requirements of paragraph A, the

ALJ concluded that she fails to meet the requirements for paragraph B or

paragraph C.  *Id.* at 13–14.  Accordingly, the Court will focus its analysis on

paragraph B and paragraph C, which are identical for Listings 12.04 and 12.06.  *See*

20 C.F.R., Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06.

Paragraph B provides that a plaintiff must demonstrate extreme limitation of

one, or marked limitation of two, of the following areas of mental functioning: (1)

understand, remember, or apply information; (2) interact with others; (3)

concentrate, persist, or maintain pace; or (4) adapt or manage oneself.  20 C.F.R.,

Pt. 404, Subpt. P., App'x 1, § 12.06(b).  Paragraph C requires that a plaintiff

demonstrate that his or her mental disorder is "serious and persistent," meaning

there is a medically documented history of the disorder for a period lasting longer

than two years.  20 C.F.R., Pt. 404, Subpt. P., App'x 1, § 12.06(c).  Additionally, the

plaintiff must provide evidence of (1) medical treatment or mental health therapy

that diminishes signs or symptoms of the mental disorder; and (2) marginal

adjustment, meaning the plaintiff has the minimum capacity to adapt to changes in

the environment or to demands not already included in the plaintiff's daily life.

*Id.*[12]  Limitations to an area of functioning are considered "marked" when the

---

[12] The criteria used to evaluate mental disorders under §§ 12.04 and 12.06, were revised effective January 17, 2017, and are therefore applicable to Figueroa's claim.  *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed Reg. 66138-01, 2016 WL 5341732, at *66138 (September 26, 2016).  "That rule notes: 'We expect that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions.'"  *Andrews v. Comm'r of Soc. Sec.*, No. 16-CV-6867 (KMK) (JCM), 2017 WL 6398716, at *10 n.4 (S.D.N.Y. Oct. 24, 2017)

ability to function independently, appropriately and effectively on a sustained basis is seriously limited, 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F2d, and are considered "extreme" when there is no ability to function independently, appropriately, and effectively on a sustained basis.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F2e.

With respect to understanding, remembering, or applying information, the ALJ found that Figueroa had only "mild limitations" based on Dr. Nikkah's findings as well as treatment records indicating Figueroa was "oriented" without evidence of delusions, hallucinations, or suicidal ideation.  AR at 13.  Figueroa testified that she struggles with understanding what she reads and that she has a "problem" forgetting dates, although she mentioned both issues in passing and did not go into detail.  *Id.* at 72, 85.  She also presented to Lubrano with confusion on January 24, 2013, *id.* at 436, and with poor memory on February 12, 2015, *id.* at 603, but these observations appear to be one-off instances.  On January 19, 2015, Dr. Nikkah tested Figueroa's recent and remote memory skills and found them to be moderately impaired "due to emotional stress secondary to pain symptoms."  *Id.* at 337.  However, Dr. Nikkah also found that Figueroa exhibited a coherent thought process and was able to understand and follow directions.  *Id.* at 337–38.  Although these findings may show more than mild limitations, the record supports the ALJ's

---

(quoting at *id.* at *66139 n.1), *adopted by* 2017 WL 6398727 (S.D.N.Y. Dec. 13, 2017).

conclusion that Figueroa's ability to understand, remember, or apply information was not "seriously limited."

With respect to interacting with others, the ALJ also found that Figueroa had only "mild limitations" based on Dr. Nikkah's findings as well as treatment records demonstrating that Figueroa was "pleasant," "cooperative," and "well-related." *Id.* at 14. While she stated at the hearing that she did not have many friends, *id.* at 83–84, there is no evidence that she had difficulty getting along with others. Moreover, although Lamour-Ocean did not appear to appreciate Figueroa's attitude and ultimately discharged her for non-compliance, Figueroa was generally cooperative with her other treatment providers. Indeed, during psychotherapy sessions, Figueroa "engaged well" with Fukuda, notwithstanding her labile affect. *Id.* at 763. Further, Figueroa reported to Dr. Nikkah that she socializes occasionally and that her family relationships were positive and supportive. *Id.* at 338. Even though Figueroa reported not wanting to leave her home on some days, *id.* at 283, there is no evidence to support Figueroa's allegedly marked or even extreme limitations in this area.

The ALJ found that Figueroa had "moderate limitations" with respect to her ability to concentrate, persist, or maintain pace. *Id.* at 14. The ALJ's finding was based on Dr. Nikkah's evaluation, which noted that Figueroa was mildly limited in her ability to maintain attention and concentration, and moderately limited in her ability to maintain a regular schedule, learn new tasks, perform complex tasks independently, and appropriately deal with stress, difficulties which were caused, in

part, by her distractibility. *Id.* at 338. Indeed, Figueroa testified that she had difficulty focusing. *Id.* at 85 ("The thing is my mind doesn't focus. I can be talking to you and I could be thinking about something else."). While her ability to concentrate, persist, or maintain pace could arguably be considered a "marked limitation" as opposed to a "moderate limitation," it is well settled that where there are conflicts in the medical evidence, "it is the ALJ's decision that controls as factfinder." *King v. Astrue*, 32 F. Supp. 3d 210, 220 (N.D.N.Y. 2012) (citing *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)); *see also Scully v. Berryhill*, 282 F. Supp. 3d 628, 636 (S.D.N.Y. 2017) (ALJ's decision upheld where medical evidence could support either finding that claimant did or did not medically equal listing).

Finally, with respect to Figueroa's ability to adapt or manage herself, the ALJ found that she had "mild limitations" based on Dr. Nikkah's examination as well as treatment records demonstrating normal mental status examinations. AR at 14. Figueroa testified while she lived alone, her mom and sister had to perform all her household chores for her. *Id.* at 57–58. However, Figueroa's difficulties keeping up her home appears to result from her physical impairments. *Id.* There is otherwise little in the record to suggest that her mental impairments limited her ability to manage herself. Thus, substantial evidence supports the ALJ's determination that Figueroa's ability to adapt or manage herself is mildly limited. *See King*, 32 F. Supp. 3d at 220.

With respect to the requirements of paragraph C of Listing 12.04, Figueroa had been receiving ongoing treatment for her depression and anxiety since 2013.

However, the record fails to establish evidence of only marginal adjustment. "Marginal adjustment" is defined as "minimal capacity to adapt to changes in [one's] environment or to demands that are not already part of [one's] daily life." 20 C.F.R. pt. 404, Subpt. P, App'x 1, § 12.02(C)(2). This generally requires a showing that any changes in a plaintiff's environment has led to a "deterioration in . . . functioning," an inability to function outside the home or "a significant change in medication or other treatment." 20 C.F.R. pt. 404, Subpt. P, App'x 1, § 12.00(G)(2)(c). The record does not contain evidence of only marginal adjustment. On the contrary, Dr. Lubrano's treatment notes indicated that Figueroa's depression and anxiety symptoms were showing improvement in 2016 and 2017. *See id.* at 389–93, 408–11, 416–19, 436–38, 454–60, 465–71, 475–81, 493–98, 501–06, 511–16, 519–23, 534–38, 562–64, 603–05, 619–21, 629–31, 639–41, 648–49, 663–64, 674–77, 693–99, 707–24, 736–44, 747–52, 769–71, 788–90, 807–09, 818–31, 837–67, 871–86, 892–897, 903–18. This is also corroborated by the fact that Figueroa was currently stable on her psychiatric medication, living alone, and had no record of mental decompensation or psychiatric hospitalization. *Id.*

Thus, the ALJ's determination that Figueroa did not meet or medically equal Listing 12.04 (and impliedly Listing 12.06) is supported by substantial evidence.[13]

---

[13] Figueroa's argument that the ALJ "seems to be imposing additional requirements on the mental health impairments" does not address the essential issue of whether substantial evidence supports the ALJ's finding that neither the Paragraph B nor Paragraph C criteria are satisfied. Pl. Mem. at 10.

### 2. The ALJ's Physical RFC Determination is Not Supported by Substantial Evidence Because the ALJ Did Not Fully Develop the Record

Figueroa also challenges the ALJ's RFC determination, arguing that the ALJ violated the treating physician rule. Pl. Mem. at 10–11. The Court concludes that the ALJ's error as to her determination of Figueroa's physical residual functional capacity lies not in her violation of the treating physician rule but rather in her failure to adequately develop the record.

The ALJ determined that Figueroa could perform light work with the following physical limitations: (1) she must be afforded the opportunity to alternate sitting and standing every thirty minutes; (2) she could not be exposed to temperature extremes, concentrated fumes, and excessive dust; and (3) she could only occasionally squat. AR at 15. In making this determination, the ALJ relied on Dr. Teli's opinion (with respect to the second and third limitations), *id.* at 343, and Figueroa's testimony at the hearing (with respect to the first limitation), *id.* at 86, while discounting Palomino's opinion. *Id.* at 16.

Palomino opined, *inter alia*, that Figueroa could only sit for one hour, stand for 30 minutes, and walk for an hour in total in an eight-hour work day, effectively finding her unable to work. *Id.* at 348. The ALJ accorded "little weight" to Palomino's opinions "since they are unsupported by the treatment notes of record, and since they are contrary to [the] findings of Dr. Teli, who found that the claimant had no such limitations." *Id.* at 16.

Figueroa argues that the ALJ violated the treating physician rule by failing to accord Palomino's opinion proper weight. Pl. Mem. at 10. However, as an initial matter, Figueroa confuses nurse practitioner Palomino for a "treating doctor." *Id.* at 2. Under the regulations, nurse practitioners are not considered "acceptable medical sources," and their opinions are therefore not "entitled to any particular weight[.]" *Wider v. Colvin*, 245 F. Supp. 3d 381, 389 (E.D.N.Y. 2017) (quotations omitted). Of course, an ALJ may not disregard opinion evidence from a nurse practitioner or "other source" solely because it was not authored by an acceptable medical source. *See, e.g., Rivera v. Colvin*, No. 13-CV-7150 (PGG), 2015 WL 1027163, at *15 (S.D.N.Y. Mar. 9, 2015) (ALJ erred by discounting nurse practitioner's opinion "on the basis of her status as 'other source'") (citation omitted). However, this is not the only or primary reason that Palomino's opinion was properly accorded "little weight." The ALJ properly found that Palomino's opinion is unsupported by the treatment notes in the record. Although not specifically pointed out by the ALJ, Palomino's opinion did not follow from her treatment of Figueroa because she treated Figueroa for her HIV condition, not her knee or back impairments. Nor does she appear to be a specialist in the relevant areas. Therefore, even if Palomino was considered an acceptable medical source, her opinion is not persuasive. *See Medick v. Colvin*, No. 16-CV-341 (CFH), 2017 WL 886944, at *6 (N.D.N.Y. Mar. 6, 2017) ("An ALJ may accord less weight to a treating physician where [s]he comments on conditions for which [s]he did not treat."); 20 C.F.R. § 404.1527(c)(2)(ii) (explaining that "if your ophthalmologist notices that you

have complained of neck pain during your eye examinations, we will consider h[er] opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain."); 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her specialty than to the opinion of a source who is not a specialist."). Regardless of the inconsistency between Palomino's and Dr. Teli's assessments, the ALJ properly accorded little weight to Palomino's opinion.

The ALJ's determination of Figueroa's physical residual functional capacity instead relied heavily on Dr. Teli's opinion. The ALJ accorded "significant weight" to Dr. Teli's opinion, finding it "persuasive and consistent that the claimant has been able to perform the exertional demands of medium work at all times relevant to this decision." AR at 16.[14]

"It is well-settled that a consulting [ ] examiner's opinion may be given great weight and may constitute substantial evidence to support a decision." *Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 577 (S.D.N.Y. 2018) (citing cases); *see Rosier v. Colvin*, 586 F. App'x 756, 758 (2d Cir. 2014) (consultative examiner's opinion constitutes substantial evidence supporting ALJ's decision to accord little weight to treating source). "It is also generally accepted that a consultative examiner's opinion may be accorded greater weight than a treating source's opinion where the ALJ finds it more consistent with the medical evidence." *Colbert*, 313 F. Supp. 3d at 577 (citation omitted).

---

[14] Once again, the ALJ presumably meant light work, not medium work.

Dr. Teli's opinion, however, does not constitute substantial evidence in this case. Dr. Teli examined Figueroa once on January 19, 2015, before two sets of diagnostic studies—the January 2017 X-rays of her left knee and back and the July 2017 MRI of her lumbar spine—were conducted and thus did not have the benefit of Figueroa's complete medical record. AR at 340–43. "Opinions from a onetime consultative physician are not ordinarily entitled to significant weight, in particular where that physician does not have the benefit of the complete medical record." *Duran v. Colvin*, No. 14-CV-8677 (HBP), 2016 WL 5369481 at \*18 (S.D.N.Y. Sept. 26, 2016); *see also Selian*, 708 F.3d at 419 ("We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination."); *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011) ("Because it is unclear whether [the consulting physician] reviewed all of [the claimant's] relevant medical information, his opinion is not 'supported by evidence of record' as required to override the opinion of [the] treating physician.").

Dr. Teli's assessment was also completed more than two years before the hearing on April 6, 2017. The ALJ made no attempt to assess whether Figueroa's condition had deteriorated in those two years. A medical opinion may be stale if it does not account for the claimant's deteriorating condition. *See, e.g., Camille v. Colvin*, 104 F. Supp. 3d 329, 343–44 (W.D.N.Y. 2015), *aff'd*, 652 F. App'x 25 (2d Cir. 2016) ("medical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding") (quotation marks and citation omitted); *Jones v. Comm'r of Soc. Sec.*, No.

10-CV-5831 (RJD), 2012 WL 3637450, at *2 (E.D.N.Y. Aug. 22, 2012) (ALJ should not have relied on medical opinion in part because it "was 1.5 years stale" as of plaintiff's hearing date and "did not account for her deteriorating condition").

More importantly, Dr. Teli's opinion is not consistent with the record as a whole, which indicates that Figueroa's back and knee impairments were not trivial. His opinion of Figueroa's physical limitations lacked any specificity and consisted only of the following: "The claimant should avoid dust and other respiratory irritants due to history of asthma. The claimant had moderate restriction for squatting." AR at 343. Dr. Teli's opinion is simply too vague and insubstantial to be relied upon. *See Burgess*, 537 F.3d at 128 (expert opinions that are vague, "not substantial," or that address only issues of which claimant was not complaining, cannot undermine treating physician opinion); *Martinez v. Colvin*, No. 13-CV-0834 (FB), 2014 WL 2042284, at *3 (E.D.N.Y. May 19, 2014) (ALJ erred in relying on consultative physician's vague report) (citing *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000)).

Because Dr. Teli did not review all of Figueroa's relevant medical information and his assessed limitations were not consistent with the record as a whole, the Court cannot say that the ALJ's physical RFC determination, which relied heavily upon Dr. Teli's opinion, was supported by substantial evidence.

That being the case, the ALJ should have worked to develop the record to obtain more useful evidence relating to Figueroa's physical limitations. That the ALJ did not seek to obtain an assessment from Lamour-Ocean, who directly treated

Figueroa's knee and back conditions for more than two years, is puzzling. Indeed, the failure to obtain Lamour-Ocean's opinion was a gaping hole in the record and the Court therefore cannot conclude that the ALJ adequately discharged her duty to develop the record. *See, e.g.*, *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015) (although evidentiary record contained treatment notes, test results, and "direct assessments of [plaintiff's] functional capacities" from consultative physicians, ALJ could not have made informed determination without treating physician's medical opinion and therefore remand was appropriate to fill gaps in record regarding plaintiff's functional limitations); *Moreira v. Colvin*, No. 13-CV-4850 (JGK), 2014 WL 4634296, at *7 (S.D.N.Y. Sept. 15, 2014) (remanding where ALJ failed to resolve "gaps and inconsistencies" in medical record and heavily relied on consultative examiner's report rather than seeking treating physician's opinion).

It is true that Lamour-Ocean is not a treating physician and her opinion may not be entitled to controlling weight, but her findings can constitute substantial evidence and should still be considered in light of her extensive treatment history with Figueroa. Opinions from sources like Lamour-Ocean are "important and should be evaluated on key issues such as impairment severity and functional effects." SSR 06-03p, 2006 WL 2329939, at *3 (SSA Aug. 9, 2006). The same factors for the evaluation of the opinions of "acceptable medical sources" are used to evaluate the opinions of nurse practitioners. SSR 06-03p, 2006 WL 2329939, at *4; *see also* 20 C.F.R. § 404.1527(c). Courts have remanded cases where the ALJ fails

to solicit the opinion of a treating nurse practitioner simply because it was the opinion of a nurse practitioner. *See, e.g., Kentile v. Colvin*, No. 13-CV-880 (MAD), 2014 WL 3534905, *8 (N.D.N.Y. July 17, 2014) (finding that, especially because of plaintiff's treatment relationship with nurse practitioner, nurse practitioner's opinion was entitled to be considered and discussed); *Ayer v. Astrue*, No. 11-CV-83 (JMC), 2012 WL 381784, at *3 (D. Vt. Feb. 6, 2012) ("[R]emand is required, given the ALJ's failure to request medical opinions from any of Ayer's treating providers, including Nurse Practitioner Laurent, which resulted in a substantial gap in the record."); *Provost v. Astrue*, No. 08-CV-1133 (VEB), 2011 WL 12472551, at *6 n.4 (N.D.N.Y. Mar. 31, 2011) ("further development of the record regarding [nurse practitioner's] assessment of [p]laintiff's mental abilities and limitations is warranted and should be undertaken on remand" in light of "long-standing treatment relationship"). Accordingly, the ALJ was obligated to obtain additional information from the treating source, namely, Lamour-Ocean, before relying heavily on the evaluation of a consultative physician who did not treat Figueroa and who did not review her complete medical history. If the ALJ decides to discount Lamour-Ocean's opinion, she must provide good reasons to do so. *See Kentile*, at *8 ("The Regulations require the ALJ to engage in a detailed analysis of [the nurse practitioner's] treatment and provide 'good reasons' for discounting his opinions.") (citing *Stytzer v. Astrue*, No. 07-CV-811 (NAM), 2010 WL 3907771, at *6 (N.D.N.Y. Sept. 30, 2010)).

Alternatively, and because Lamour-Ocean terminated her treatment of Figueroa during the period of alleged disability, the ALJ could have obtained an RFC assessment or medical source statement by ordering an additional examination from a physician or soliciting testimony from a medical expert, either of whom would have had the benefit of reviewing Figueroa's complete medical history. "As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations . . . to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing." *Gross v. Astrue*, No. 12-CV-6207P (MWP), 2014 WL 1806779, at *18 (W.D.N.Y. May 7, 2014). Putting aside Palomino's and Dr. Teli's opinions as they do not constitute substantial evidence, the record relating to Figueroa's physical impairments generally consists of treatment notes, bare medical findings and subjective complaints, and does not address how Figueroa's knee and back impairments affect her physical ability to perform work-related functions. Despite the lack of any supported opinion from a medical source, the ALJ determined that Figueroa retained the physical RFC to perform light work with limitations on squatting and exposure to respiratory irritants. Under these circumstances, the ALJ's determination of Figueroa's physical RFC is not supported by substantial evidence.

In addition to the record lacking a supported opinion, Figueroa claims that she engaged in physical therapy, despite the absence of physical therapy treatment

notes in the record.  Pl. Mem. at 11.  This ambiguity is compounded by references in

the record suggesting that she refused physical therapy, AR at 774, 805, and other

references in the record indicating that physical therapy has been helpful.  *Id.* at

450, 472, 482, 491, 499, 507, 569, 650, 665, 675, 690.  Evidence surrounding

Figueroa's physical therapy should have indicated her progress or lack of progress

on criteria such as range of motion and may also have been relevant to determining

her medical conditions.

Because of these deficiencies in the record, it is unclear whether a detailed

assessment by Lamour-Ocean (or a recent consultative examiner or medical expert)

or progress notes from physical therapy, if obtained by the ALJ, would have altered

the ALJ's conclusion that Figueroa was able to perform light work.  Thus, the

additional evidence would have been important for a proper physical RFC

determination.  In sum, the ALJ did not satisfy her duty to develop and complete

the record, and her physical RFC finding was not supported by substantial

evidence.  Remand is therefore appropriate.[15]

---

[15] At the outset of her motion, Figueroa requests the Court to consider remanding the case solely for the calculation of benefits.  *See* Pl. Mot.  While a court may do so when "the records provide[ ] persuasive evidence of total disability that render[s] any further proceedings pointless," *Williams*, 204 F.3d at 50, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [courts] have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts*, 94 F.3d at 39 (quoting *Parker*, 626 F.2d at 235) (alteration in original).  Thus, only where the record is complete and provides persuasive proof of disability, can a court remand solely for the calculation of benefits.  Given the incompleteness of the record here, the Court will not remand solely for the calculation of benefits at this time.

### 3. The ALJ's Violation of the Treating Physician Rule in Determining Figueroa's Mental RFC was Harmless

Concerning Figueroa's mental RFC, the ALJ determined that she was limited to a simple job, could only occasionally tolerate changes in the workplace, and could only occasionally tolerate social interaction with co-workers, supervisors, and the general public. AR at 15. Although she does not specify what about the ALJ's mental RFC finding is unsupported, Figueroa argues the ALJ violated the treating physician rule as to Dr. Lubrano. Pl. Mem. at 10–11. As the record reflects, Dr. Lubrano treated Figueroa for depression and anxiety from January 2013 through at least April 2017.

"Social Security Administration regulations, as well as [Second Circuit] precedent, mandate specific procedures that an ALJ must follow in determining the appropriate weight to assign a treating physician's opinion." *Estrella*, 925 F.3d at 95. "First, the ALJ must decide whether the opinion is entitled to controlling weight." *Id.* The ALJ must afford controlling weight to a treating physician's opinion as to the nature and severity of the impairment if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (citing *Burgess*, 537 F.3d at 128). If there is substantial evidence in the record that contradicts or questions the credibility of a treating source's assessment, the ALJ may give that treating source's opinion less deference. *See Halloran*, 362 F.3d at 32.

Second, if the ALJ does not give controlling weight to a treating source's opinion, the ALJ must consider various factors and provide "good reasons" for the weight given. 20 C.F.R. § 404.1527(c)(2)–(6); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015). These "nonexclusive '*Burgess* factors' [include]: '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Estrella*, 925 F.3d at 95–96 (citing *Selian*, 708 F.3d at 418). "[T]o override the opinion of the treating physician . . . the ALJ must explicitly consider" the foregoing factors. *Greek*, 802 F.3d at 375 (alteration in original) (quoting *Selian*, 708 F.3d at 418). "An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96. If the ALJ does not "explicitly" consider these factors, the case must be remanded unless "a searching review of the record" assures the Court that the ALJ applied "the substance of the treating physician rule." *Id.*

Because the ALJ assigned "little weight" to Dr. Lubrano's opinion, the ALJ should have "explicitly" addressed the *Burgess* factors in her decision. *See Estrella*, 925 F.3d at 95; *cf. Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (core question is whether "the ALJ's reasoning and adherence to the regulation are clear"). But her decision offered only perfunctory reasoning as to why she discounted Dr. Lubrano's opinions:

> I [] give little weight to these assessments since they are unsupported by treatment notes, which indicate no such limitations to a marked or

> extreme degree.  Moreover, I note that Dr. Lubrano's assessments are contrary to the results of the multiple mental status examinations, cited above, which indicate no such limitations.  Dr. Lubrano's conditions are further contradicted by Dr. Nikkah's findings, cited above, which establish that the claimant's mental impairment causes only mild to moderate functional limitations.

AR at 17.

Although the ALJ committed procedural error by not explicitly discussing the *Burgess* factors, the error was harmless.  An explicit consideration of the *Burgess* factors would not have led the ALJ to a different result.  When evaluating the "frequen[cy], length, nature, and extent of treatment," *Burgess*, 537 F.3d at 129, one finds, despite the multi-year treatment relationship between Dr. Lubrano and Figueroa, that the "nature and extent of [plaintiff's] treatment" concerned only medication management and unspecialized treatment.

*Burgess* also requires the evaluation of "the amount of medical evidence supporting [Dr. Lubrano's] opinion."  *Id.*  Dr. Lubrano opined that Figueroa had either marked or extreme limitations in all areas of mental functioning necessary to engage in work activity.  AR at 354–57; 376–79.  After reviewing the record, the Court agrees that such limitations are not supported by objective medical evidence and, as discussed below, are contradicted by the doctor's own contemporaneous progress notes.  Figueroa maintains that Dr. Lubrano's opinions were "based on medical records which are part of the ongoing treatment and not just letters to the Social Security Administration."  Pl. Mem. at 10.  However, Figueroa does not specifically identify which medical evidence corroborates Dr. Lubrano's findings.

The third *Burgess* factor considers the consistency of the opinion with the remaining medical evidence, including the source's own treatment records. Despite his assessment that Figueroa was markedly or extremely limited by her mental impairments, Dr. Lubrano's internal treatment notes contained little objective evidence or even basic mental status examinations. *Johnson v. Comm'r of Soc. Sec.*, 669 F. App'x 580, 581 (2d Cir. 2016) ("ALJs are not required to give controlling weight to opinions that are not consistent with other substantial evidence in the record.") (citing *Halloran*, 362 F.3d at 32). Indeed, the only finding Dr. Lubrano made regarding Figueroa's mental status was that she was "not exhibiting signs of psychosis [or] . . . signs of mania." AR at 391, 409, 417, 436, 458, 469, 479, 496, 504, 514, 521–22, 536. Instead, his progress notes cite Figueroa's improvements and ultimate stabilization with medication. *See id.* at 389–93, 408–11, 416–19, 436–38, 454–60, 465–71, 475–81, 493–98, 501–06, 511–16, 519–23, 534–38, 562–64, 603–05, 619–21, 629–31, 639–41, 648–49, 663–64, 674–77, 693–99, 707–24, 736–44, 747–52, 769–71, 788–90, 807–09, 818–31, 837–67, 871–86, 892–897, 903–18. *See also Evans v. Comm'r of Soc. Sec.*, 110 F. Supp. 3d 518, 536 (S.D.N.Y. 2015) (treating physician's opinion was not entitled to controlling weight where her "treatment records . . . consistently show stable mental examination findings . . . contrary to her marked and extreme limitations"). The records also reveal no side effects from her prescribed medications and no evidence of suicidal ideation, delusions, or hallucinations. AR at 389–93, 408–11, 416–19, 436–38, 454–60, 465–71, 475–81, 493–98, 501–06, 511–16, 519–23, 534–38, 562–64, 603–05, 619–21, 629–31, 639–41,

648–49, 663–64, 674–77, 693–99, 707–24, 736–44, 747–52, 769–71, 788–90, 807–09, 818–31, 837–67, 871–86, 892–897, 903–18. An ALJ can decline to give controlling weight to a treating physician's opinion where "contemporaneous treatment records, including the [plaintiff's] 'largely normal mental status examinations on both treating and consultative evaluations,' did not support such severe limitations." *Ortiz v. Comm'r of Soc. Sec.*, No. 15-CV-07602 (SN), 2017 WL 519260, at *8 (S.D.N.Y. Feb. 8, 2017) (quoting *Camille*, 104 F. Supp. at 341); *see also Pagan v. Colvin*, No. 15-CV-3117 (HBP), 2016 WL 5468331, at *13 (S.D.N.Y. Sept, 29, 2016) ("[T]he ALJ provided good reasons for affording 'little weight' to [the treating psychiatrist's] opinion, namely that it was unsupported by [the treating psychiatrist's] own treatment notes, which showed that plaintiff had overall normal mental status examinations and there was general improvement in plaintiff's mood and anxiety over the course of treatment."). Overall, the record does not support the severity of the restrictions assessed by Dr. Lubrano, and thus, the ALJ was not required to give his opinion controlling weight. *See Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (ALJ did not need to afford treating source's opinion controlling weight because it conflicted with source's own treatment notes); *Illenberg v. Colvin*, No. 13-CV-0916 (AT) (SN), 2014 WL 6969550, at *20 (S.D.N.Y. Dec. 9, 2014) ("When a treating physician's opinion is internally inconsistent . . . the ALJ may give the treating physician's opinion less weight.") (adopting report and recommendation).

Regarding specialization, there is no indication that Dr. Lubrano is a specialist in mental health treatment, contrary to Figueroa's claim. Pl. Mem. at 11. *See* 20 C.F.R. § 404.1527(d)(2) (treating physician's opinion entitled to less weight when the opinion is not from a specialist); *Halloran*, 362 F.3d at 32. This factor is relevant, given that Dr. Lubrano's opinions address Figueroa's mental health, an area in which Dr. Lubrano does not specialize; and the regulations provide that the ALJ must "generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(c)(5).

To the extent the ALJ erred in failing to properly analyze Dr. Lubrano's opinions, the error was harmless. *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (declining to remand even though ALJ failed to satisfy treating physician rule where "application of the correct legal principle could lead [only to the same] conclusion"). Accordingly, although Dr. Lubrano is Figueroa's treating physician, there exists substantial evidence in the record to support the ALJ's decision to assign "little weight" to Dr. Lubrano's opinion. As such, there is no merit to Figueroa's argument that the ALJ failed to abide by the treating physician rule. *See, e.g., Schmidt v. Colvin*, No. 15-CV-2692 (MKB), 2016 WL 4435218, at *12 (E.D.N.Y. Aug. 19, 2016) (upholding ALJ's decision to accord "little weight" to opinion of treating psychiatrist because it "was not supported by his own treatment records, which show that Plaintiff reported responding well to his medication, had repeatedly normal mental status examinations, and was consistently assessed as

mentally stable"); *Evans*, 110 F. Supp. 3d at 536 (finding substantial evidence to support ALJ's decision to give "little weight" to opinion of treating therapist where plaintiff had a "conservative treatment history," and treatment records "consistently show[ed] stable mental examination findings and that [the plaintiff's] anxiety [was] controlled with Xanax") (internal quotation marks omitted).[16]

The ALJ's mental RFC determination instead relied heavily on the opinion of consultative psychologist Dr. Nikkah. AR at 17. As discussed above, the Second Circuit has cautioned that "ALJs should not rely heavily on the findings of consultative physicians after a single examination," *Selian*, 708 F.3d at 419. However, where the treating physician's opinion conflicts with substantial evidence in the record, a consultative examiner's opinion may constitute substantial evidence to contradict the opinion of a treating physician. *Mongeur*, 722 F.2d at 1039. Thus, "an ALJ may give greater weight to a consultative examiner's opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence." *Suarez v. Colvin*, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) (citing cases); *Leisten v. Colvin*, No. 12-CV-6698 (FPG),

_____

[16] Because the ALJ did not reject Dr. Lubrano's opinion due to gaps in the record, he was not required to contact the physician for further information or clarification. *See, e.g.*, *Micheli v. Astrue*, 501 F. App'x 26, 29–30 (2d Cir. 2012) (ALJ not required to re-contact treating physician to whose opinion ALJ does not accord controlling weight where such opinion was internally inconsistent and also inconsistent with treatment records and other physician's opinions); *Brown v. Comm'r of Soc. Sec.*, No. 13-CV-0827 (JMF) (GWG), 2014 WL 783565, at *17–18 (S.D.N.Y. Feb. 28, 2014) (ALJ fulfilled his duty to develop record without further contact with treating physician upon determination that physician's opinion was inconsistent with other evidence in record).

2014 WL 4275710, at *12–14 (W.D.N.Y. Aug. 28, 2014) (ALJ properly awarded treating physician's opinion little weight and substantial weight to consultative examiners' opinions because treating physician's opinion was inconsistent and unsupported, whereas consultative opinions were supported by their examination results).

The ALJ determined that Dr. Nikkah's opinion merited "significant weight" because it was more consistent with the evidence as a whole. AR at 17. This determination is supported by substantial evidence, as the notes of Dr. Lubrano and Fukuda, as well as the opinion of the state agency examiner, support Dr. Nikkah's findings that Figueroa had depression and anxiety with persistent symptoms but only mild to moderate restrictions in key functional areas. It is only Dr. Lubrano's opinion that stands out. Thus, having properly rejected his opinion, the ALJ was not required to give Dr. Nikkah's opinion *less* weight even though it more accurately reflects Figueroa's mental limitations. Because Dr. Nikkah's opinion could constitute substantial evidence and was more consistent with the record as a whole, including Dr. Lubrano's notes, than Dr. Lubrano's own opinions, the ALJ did not err in assigning it great weight. *See Smith v. Colvin*, 17 F. Supp. 3d 260, 268 (W.D.N.Y. 2014) ("[T]he opinions of consulting sources 'may constitute substantial evidence if they are consistent with the record as a whole.'") (quoting *Barringer v. Comm'r of Soc. Sec.*, 358 F. Supp. 2d 67, 79 (N.D.N.Y. 2005)); *Vanterpool v. Colvin*, No. 12-CV-8789 (VEG) (SN), 2014 WL 1979925, at *16 (S.D.N.Y. May 15, 2014)

(ALJ did not err in affording greater weight to opinion of consultative physician where opinion was more consistent with treating physician's medical records).[17]

In sum, the ALJ did not err in declining to adopt the extremely restrictive opinion offered by Dr. Lubrano because, *inter alia*, it was not supported by substantial evidence in the record, including his own treatment notes. The ALJ also did not err in giving greater weight to Dr. Nikkah's opinion because it was more consistent with the underlying medical evidence. *See, e.g.*, *Frawley v. Colvin*, No. 13-CV-1567(LEK), 2014 WL 6810661, at *5–7, *9–10 (N.D.N.Y. Dec. 2, 2014) (ALJ's decision to give great weight to consultative psychologist's opinion was supported by substantial evidence because opinion was consistent with same medical evidence relied on by ALJ to reject treating psychologist's opinion).

---

[17] This assessment is distinguishable from the Court's rejection of the opinion of consultative examiner Dr. Teli. With respect to Figueroa's physical RFC, the ALJ heavily relied on Dr. Teli's opinion before seeking an opinion from Figueroa's treating nursing practitioner Lamour-Ocean. Conversely, Figueroa's treating physician Dr. Lubrano did, in fact, assess her mental RFC, but his opinions were not supported by his own treatment notes (which were more consistent with Dr. Nikkah's opinion). Dr. Teli's opinion was not consistent with the underlying medical evidence and therefore does not constitute substantial evidence in support of the ALJ's determination of Figueroa's physical RFC. Moreover, although Dr. Nikkah's opinion was based on only part of the overall administrative record, the treatment notes in the record before and after Dr. Nikkah's opinion demonstrate substantially similar limitations and findings, whereas Dr. Teli's examination preceded diagnostic studies that potentially demonstrated a deterioration in Figueroa's physical conditions.

### 4. **The ALJ Should Reevaluate Her Credibility Determination on Remand**

Figueroa also challenges the ALJ's credibility determination, arguing that the ALJ failed to consider the effects of her medication or the severity of her impairments. Pl. Mem. at 11–12. Because the Court concludes that the ALJ did not fully develop the record and remands on that basis, the Court need not decide this issue. The Court will, however, discuss Figueroa's contention to the extent that the ALJ's credibility determination does raise concerns that should be addressed on remand.

While "[i]t is the function of the [Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant," *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (alterations in original, citation and internal quotation marks omitted), the "ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the ALJ gave to the individual's statements and the reasons for that weight." *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (internal alternations and quotation marks omitted). As long as the ALJ provides a sufficiently specific rationale for finding a claimant's testimony not credible, the decision is "generally entitled to deference on appeal." *Selian*, 708 F.3d at 420; *see also Wicks v. Colvin*, No. 15-CV-937 (LEK) (ATB), 2016 WL 6110503, at *8 (N.D.N.Y. Oct. 19, 2016) ("An ALJ may properly reject subjective complaints after weighing the objective medical evidence in the record, the

claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (internal alterations and quotation marks omitted), *adopted by*, 2016 WL 6106471 (N.D.N.Y. Oct. 19, 2016).

In assessing a claimant's credibility, an ALJ must consider all available evidence, while providing "specific reasons for the weight accorded to the claimant's testimony." *Alcantara v. Astrue*, 667 F. Supp. 2d 262, 277 (S.D.N.Y. 2009) (citations omitted). In addition, the regulations direct the ALJ to consider information regarding: (i) the claimant's daily activities; (ii) the location, duration, frequency, and intensity of his or her symptoms; (iii) any precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medications taken; (v) treatment other than medication used to relieve the claimant's symptoms; (vi) any measures used to relieve his or her symptoms; and (vii) other factors concerning functional limitations and restrictions resulting from the claimed symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c).

The ALJ did not address the applicable factors and did not adequately explain her credibility determination. Rather, the ALJ perfunctorily concluded that Figueroa's allegations regarding her physical impairments were not supported by the findings from her physical examinations and the objective medical evidence. AR at 15–16. Yet the ALJ did not address the evidence in support of Figueroa's complaints, such as the 2017 MRI results submitted after the hearing. The ALJ also completely failed to address Figueroa's allegations related to her mental

impairments. *See Fernandez v. Astrue*, No. 11-CV-3896 (DLI), 2013 WL 1291284 at

*19 (E.D.N.Y. Mar. 28, 2013) ("The ALJ . . . erred in failing to provide any further

basis for finding [p]laintiff not credible and did not evaluate [p]laintiff's testimony

in light of the seven factors as required."); *Norman v. Astrue*, 912 F. Supp. 2d 33, 44

(S.D.N.Y. 2012) ("What is missing from such an analysis is any explanation as to

why [p]laintiff's subjective complaints were found less than fully credible.")

(internal quotation and citation omitted).

Nevertheless, without a fully developed record, a reviewing court cannot

conclude whether substantial evidence supported the ALJ's credibility finding. *See*

*Meniman v. Comm'r of Soc. Sec.*, No. 14-CV-3510 (PGG) (HBP), 2015 WL 5472934,

at *23 (S.D.N.Y. Sept. 17, 2015) (adopting report and recommendation). As such,

upon developing the record, the ALJ should also reassess Figueroa's credibility with

reference to the factors listed in § 404.1529(c)(3). *See Rosa*, 168 F. 3d at 82 n.7

(refusing to accept ALJ's conclusion as to plaintiff's credibility given failure to

develop the record); *see also Garretto v. Colvin*, No. 15-CV-8734 (HBP), 2017 WL

1131906, at *22 (S.D.N.Y. Mar. 27, 2017) (ALJ should re-evaluate the plaintiff's

testimony after "taking steps to develop the record as directed").

### 5. The ALJ Denied Figueroa Due Process

Although not raised by Figueroa, the Court is troubled by the fact that she

was precluded from cross-examining the vocational expert—and thereby denied due

process—when the ALJ declined to forward her counsel's proposed RFC to the

vocational expert. The ALJ reasoned that counsel "did not actually request that

such hypothetical be submitted to the vocational expert" and "the hypothetical, as phrased by Ms. Gilmore, is improperly formed." AR at 10. By accepting the opinion of the vocational expert without allowing for additional input from Figueroa, the ALJ did not fully and fairly develop the record.

As part of procedural due process, a claimant has the right to cross-examine the author of expert opinions, particularly when the expert's evidence is obtained by the ALJ after the hearing. *See Townley v. Heckler*, 748 F.2d 109, 114 (2d Cir. 1984) (ALJ's use of post-hearing vocational report as primary evidence upon which to deny benefits without affording claimant right to cross-examine and to present rebuttal evidence violated claimant's due process rights; "[a]lthough the ALJ asked [the claimant's] attorney to submit objections and additions to the interrogatories posed to the vocational expert, there is no evidence that the attorney's suggestions were ever forwarded. [A]ppellant was denied his due process rights . . . ."). Indeed, the regulations state that "[t]he administrative law judge may ask the witnesses any questions material to the issues and shall allow the parties or their designated representatives to do so." 20 C.F.R. § 404.950(e).

The ALJ's failure to proffer to the vocational expert Figueroa's proposed RFC deprived Figueroa of her fundamental right, under the agency's own rules, to submit additional evidence through the vocational expert. Figueroa did not waive her right by not explicitly requesting that the hypothetical be forwarded to the vocational expert. To the contrary, by proposing an alternative RFC in response to the ALJ's proffer letter, Figueroa effectively invoked her right to cross-examine and

rebut the vocational expert's post-hearing testimony. *See, e.g., Brennan v. Colvin*, No. 13-CV-6338 (AJN) (RLE), 2015 WL 1402204, at *16 (S.D.N.Y. Mar. 25, 2015) (due process required affording plaintiff right to cross examine vocational expert, review vocational expert's report, and present rebuttal evidence); *Rahe v. Astrue*, 840 F. Supp. 2d 1119, 1137–39 (N.D. Iowa 2011) (claimant's due process rights violated when counsel submitted additional interrogatories but ALJ declined to forward those interrogatories to vocational expert).

Because Figueroa's proposed RFC to the vocational expert was reasonably necessary to the full development of her case, on remand, she must be allowed the right to cross-examine in deference to her due process rights.

## III.    CONCLUSION

For the foregoing reasons, Figueroa's motion for judgment on the pleadings is granted, the Commissioner's cross-motion is denied, and the case is remanded to the ALJ pursuant to sentence four of 42 U.S.C. § 405(g). Specifically, on remand, the ALJ should:

(1) Further develop the evidentiary record by soliciting a function-by-function assessment or similar testimony from Lamour-Ocean regarding Figueroa's symptoms and functional limitations, and specify what weight she affords Lamour-Ocean's opinion, and by obtaining a new consultative examination from a physician (or solicit testimony from a medical expert) who will have access to the full record;

(2) Resolve the ambiguity with respect to Figueroa's physical therapy history;

(3) Reevaluate Figueroa's credibility in light of all the relevant medical and other evidence; and

(4) Ensure Figueroa has a meaningful opportunity to cross-examine the vocational expert.

The Clerk of Court is directed to close docket entries 15 and 20, and to terminate this action.

**SO ORDERED.**

Dated:  September 27, 2019
      New York, New York

_____
JAMES L. COTT
United States Magistrate Judge